Estate of E. C. Rider, Deceased, Nettie M. Rider, Executrix v. Commissioner. Estate of E. C. Rider, Deceased, Nettie M. Rider, Executrix, and Nettie Rider, Individually v. Commissioner.
Estate of Rider v. Commissioner
Docket Nos. 61089, 61090.
United States Tax Court
T.C. Memo 1960-124; 1960 Tax Ct. Memo LEXIS 164; 19 T.C.M. (CCH) 648; T.C.M. (RIA) 60124; June 10, 1960
*164 Held, respondent properly reconstructed petitioners' income for the years 1943 through 1949 by the use of the net worth method and the deficiencies determined thereby, with adjustments for the years 1943, 1944, and 1945, are sustained. Held further, that at least a part of the deficiency for each of the years in issue was due to fraud with intent to evade tax; and that the assessment and collection of the deficiency and addition to tax for each of the years 1943 through 1946 are not barred by limitations. W. S. Miller, Jr., Esq., for the petitioners. D. M. Moore, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The respondent determined deficiencies in income and victory tax, income tax and *165 additions to tax of E. C. Rider and Nettie M. Rider as follows: Addition
to Tax
Docket No. 61089
Tax
Year
Deficiency
Section
293(b)
E. C. Rider
Income and
Victory
1943
$10,976.67
$ 5,488.33
Income
1944
5,121.06
2,560.53
Income
1945
10,328.49
5,164.24
Income
1946
22,787.94
11,393.97
Income
1947
18,253.81
9,126.90
Docket No. 61090
E. C. Rider and Nettie M. Rider
Income
1948
$21,168.50
$10,584.25
Income
1949
4,411.12
2,205.56
The following issues are presented for decision. 1. Whether respondent correctly determined deficiencies against petitioners for each of the years 1943 through 1949. 2. Whether any part of the deficiency for each of the years in issue was due to fraud with intent to evade tax. 3. Whether the assessment and collection of the deficiency and addition to tax for each of the years 1943 through 1946 are barred by limitations. Findings of Fact The stipulated facts are so found. During the years in issue E. C. Rider and Nettie M. Rider were husband and wife, residing at Batesville, Arkansas. E. C. Rider died on April 20, 1959, and Nettie M. Rider is the duly *166 appointed executrix of his estate and the Estate of E. C. Rider, Deceased, Nettie M. Rider, Executrix, was, on July 7, 1959, by Order of this Court, duly substituted as party petitioner for E. C. Rider. Nettie M. Rider, in her individual capacity, is involved herein only because she filed joint income tax returns with E. C. Rider for the years 1948 and 1949. For the taxable years 1943 through 1947, E. C. Rider filed an individual income tax return with the collector of Internal Revenue for the district of Arkansas. For the taxable years 1948 and 1949, E. C. Rider and Nettie M. Rider filed joint income tax returns with the collector of internal revenue for the district of Arkansas. The net income (or loss) and the income tax liability reported on these returns were as follows: Net Income
Income Tax
Year
(or Loss)
Liability
1943
($ 6,217.59)
1944
121.88
1945
7,321.45
$ 1,503.22
1946
18,842.54
5,815.21
1947
28,004.34
10,794.56
1948
7,755.81
1,158.80
1949
20,628.75
4,435.48
E. C. Rider, hereinafter referred to as petitioner, was engaged in various business enterprises during the years involved. Throughout said period he owned an interest in *167 the Hutson Motor Company, a corporation having a franchise to sell Ford products and services at Newport, Arkansas. In addition, he owned Batesville Motor Company, a corporation engaged in the sale of Ford products and services at Batesville, Arkansas. In 1943, petitioner liquidated Batesville Motor Company and thereafter he conducted the same business as a sole proprietorship under the name of Rider Motor Company. During these same years, petitioner also owned and operated as a sole proprietorship a business known as E. C. Rider, Consignee, The Texas Company. This business had bulk oil plants at Batesville and at Bald Knob, Arkansas, and was engaged in the distribution of petroleum products. In 1943, petitioner set up a separate dealership in automobiles at Augusta, Arkansas and owned and operated it as a sole proprietorship under the name of Augusta Motor Company through 1949. In 1945, petitioner founded a business in Batesville, Arkansas, known as E. R. Tractor Company. This business was owned and operated as a sole proprietorship through 1949 and dealt in tractors and implements. Starting in 1947, petitioner founded a business dealing in tires and tubes. This business was known *168 as E. C. Rider Tire Company and was owned and operated as a sole proprietorship through 1949. In addition to the above, petitioner owned farm lands in Independence and Sharp Counties, Arkansas, upon which he raised cattle during the period 1943 through 1948. Petitioner also bought and sold city real estate in Batesville, Arkansas, during this period. Throughout the period 1943 through 1949, Dean Wiles was in charge of the bookkeeping for all of petitioner's businesses except his farm operations. Wiles started working for petitioner in January 1936. The books and records of Rider Motor Company, Augusta Motor Company, E. R. Tractor Company, E. C. Rider, Consignee, The Texas Company, and E. C. Rider Tire Company were all maintained on an accrual basis of accounting, and income therefrom was reported on said basis in the income tax returns petitioner filed for the calendar years 1943 through 1949. When petitioner commenced the business operated as E. C. Rider, Consignee, The Texas Company, he ran the receipts and expenditures for that business through the E. C. Rider checking account at the First National Bank of Batesville, Arkansas. This account was petitioner's personal account. *169 On February 2, 1948, petitioner established a separate account at the First National Bank of Batesville to handle the business and this account was entitled E. C. Rider, Consignee. Petitioner never had Wiles set up books and records on his farm operations. Some items relating to his farm, however, which were handled through his personal account at the First National Bank of Batesville prior to February 2, 1948, were recorded in the books and records of the business known as E. C. Rider, Consignee, The Texas Company. Such items were charged or credited to an accounts receivable for petitioner so as to segregate his personal and farm transactions from those of the business. Other farm items and personal transactions that came through the bank accounts of the Rider Motor Company were recorded on the books and records of that business as charges or credits to a personal account for petitioner. Petitioner's farm income and expenses were reported on the cash basis of accounting. Wiles prepared monthly, semiannual, and annual operating statements, balance sheets and other statistical reports on each of petitioner's businesses except his farm. Petitioner reported income and claimed expenses *170 on his Federal income tax returns for each of the years 1943 through 1949 as follows: E. C. RIDER - INCOME TAX RETURNS, 1943-1949
Income
1943
1944
1945
Salaries: Huston Motor Co.
$ 3,000.00
$ 2,400.00
$ 2,775.00
Batesville Motor Co.
1,200.00
Highway Commission
Dividends: Hutson Motor Co.
7,490.00
5,300.00
6,012.50
Rents:
(102.00) *
400.00
Net Profit (Loss): Farm
(14,238.50)
(10,823.52)
(11,181.88)
*
Augusta Motor Co.
( 2,396.01)
305.69
3,684.93
E. C. Rider, Consignee
3,128.44
1,732.81
2,245.85
Batesville Motor Co. (Corp.)
(4,401.52)
Rider Motor Co.
1,308.90
5,345.95
E. R. Tractor Co.
(195.01)
E. C. Rider Tire Co.
Total Income (Loss)
($6,217.59)
$ 121.88
$ 9,087.34
Deductions
Capital Loss:
General Expense:
Travel
$ 457.89
Attorney fees defending
300.00
rental lease
Miscellaneous
258.00
Building repairs
750.00
Use of 2 cars, airplane,
pilot's wages, etc.
Securing franchise for
Mercury cars
Attorney fees all legal
matters
Business bad debts
Depreciation - airplane
(cars in 1949)
Repairs: E. R. Tractor Co.
Ford Service Station
Commissions paid
Storage
Total
$ 1,765.89
Adjusted Gross Income (Loss)
($6,217.59)
$ 121.88
$ 7,321.45
Page 3 Deductions
Net Income (Loss)
($6,217.59)
$ 121.88
$ 7,321.45
*171 E. C. RIDER - INCOME TAX RETURNS, 1943-1949
Income
1946
1947
1948
1949
Salaries: Huston Motor Co.
$ 9,880.00
Batesville Motor Co.
Highway Commission
$ 390.00
Dividends: Hutson Motor Co.
1,800.00
Rents:
180.00
Net Profit (Loss): Farm
(20,426.29)
(8,315.62)
($12,618.14)
($3,272.21)
Augusta Motor Co.
8,787.08
19,473.19
16,001.89
9,891.49 *
E. C. Rider, Consignee
4,713.72
721.74
(1,826.62)
1,334.55
Batesville Motor Co. (Corp.)
Rider Motor Co.
27,942.59
30,980.61
15,073.25
22,055.59 *
E. R. Tractor Co.
400.44
4,986.72
8,194.49
4,174.24
E. C. Rider Tire Co.
78.10
737.84
Total Income (Loss)
$33,277.54
$48,236.64
$24,902.97
$34,921.50
Deductions
Capital Loss:
$ 1,575.00
General Expense:
$ 7,200.00
Travel
Attorney fees defending
rental lease
Miscellaneous
Building repairs
Use of 2 cars, airplane,
7,200.00
$ 7,200.00
$ 7,200.00
pilot's wages, etc.
Securing franchise for
1,500.00
Mercury cars
Attorney fees all legal
1,350.00
2,400.00
2,400.00
1,906.70
matters
Business bad debts
1,810.00
Depreciation - airplane
2,600.00
2,441.74
2,906.22
(cars in 1949)
Repairs: E. R. Tractor Co.
1,280.00
Ford Service Station
972.00
371.39
Commissions paid
1,800.00
840.00
Storage
91.86
Total
$13,435.00
$16,252.00
$12,413.13
$12,944.78
Adjusted Gross Income (Loss)
$19,842.54
$31,984.64
$12,489.84
$21,976.72
Page 3 Deductions
1,000.00
3,980.30
4,338.09
1,347.97
Net Income (Loss)
$18,842.54
$28,004.34
$ 8,151.75
$20,628.75
*172 In the same income tax returns, the following amounts were charged, in the years indicated, as travel and entertainment expenses in determining the net profit of the respective businesses involved: 1946
1947
1948
1949
Augusta Motor Co.
$ 531.78
$ 807.34
$1,551.47
$1,132.11
E. C. Rider, Consignee
5.52
6.85
559.89
981.71
Rider Motor Co.
1,560.15
1,820.23
1,147.29
1,355.14
E. R. Tractor Co.
107.75
53.97
729.65
642.00
Total
$2,205.20
$2,688.39
$3,988.30
$4,110.96
For the years 1933 through 1942, petitioner paid Federal income taxes as follows: Year
Amount
1933
$ 13.32
1934
3.53
1935
302.82
1936
259.22
1937
56.28
1938
1939
$119.13
1940
259.41
1941
984.73
1942
Some time prior to December 31, 1942, petitioner acquired certain real property in Batesville, Arkansas, described as Lots 11 and 12, Block 3, Maxfield Addition, for a cost of $500. By deed dated July 20, 1944, petitioner sold Lot 12, Block 3, Maxfield Addition, to W.H. and Zelma Brokaw for a consideration *173 of $500. On July 22, 1944, this sum of $500 was credited to the account receivable for petitioner in the E. C. Rider, Consignee, The Texas Company, books. By deed dated August 8, 1944, petitioner sold the West Half of Lot 11, Block 3, Maxfield Addition, to W.H. and Zelma Brokaw for $500. Petitioner made no deposit of the $500 received on this sale. By deed dated August 8, 1944, petitioner sold the East Half of Lot 11, Block 3, Maxfield Addition, to W. H. Powell for $50. On August 12, 1944, the $50 received from this sale was credited to the account receivable for petitioner in the E. C. Rider, Consignee, The Texas Company, books. Petitioner reported no gain from the sale of realty on the Federal income tax return he filed for the calendar year 1944. On or about April 18, 1944, petitioner sold some hogs to Bolin and Wheeler for the total sum of $1,156.63. This sum was credited to the account receivable of petitioner in the E. C. Rider, Consignee, The Texas Company, books and was never included in any operating or profit and loss account of that business. Petitioner did not report any receipts from the sale of hogs in the Federal income tax return he filed for the calendar year 1944. *174 On or about September 2, 1944, petitioner sold some livestock for $1,400. This sum was credited to the account receivable for petitioner on the E. C. Rider, Consignee, The Texas Company, books on that date. On his Federal income tax return for the calendar year 1944, receipts of $1,432 from the sale of 54 head of cattle raised on his farm were reported. No other livestock sales were reported for that year. On January 21, 1946, Pleas Sullivan gave petitioner a check for $1,000 payable to petitioner as down payment on a Ford dump truck. This sum was never recorded in any income account in the petitioner's books and records. Some time prior to December 31, 1942, petitioner acquired the real estate known as Lot 4, Block 1, Highland Addition, Batesville, Arkansas, for the sum of $3,750. By deed dated March 9, 1946, petitioner sold said Lot 4, Block 1, Highland Addition, for $4,000. This sum was deposited in the E. C. Rider account at the First National Bank of Batesville on March 11, 1946. As of December 31, 1945, depreciation totaling $2,100 was allowed or allowable on this property. The deposit was credited to the account receivable of petitioner in the E. C. Rider, Consignee, *175 The Texas Company, books. The sale of the property was not reported in the Federal income tax return of petitioner for the calendar year 1946. On January 16, 1946, petitioner purchased Lot 5, Block 67, School Addition, Batesville, Arkansas, for a consideration of $2,700. By deed dated September 10, 1946, Lot 5, Block 67, School Addition, was sold to Robert A. and Elinor Leonard for a consideration of $4,000. This sum was credited to the E. C. Rider investment account on the records of Rider Motor Company, but no part of the receipt was ever included in any profit and loss account in any of petitioner's books and records and no part thereof was ever reported as income in any of petitioner's Federal income tax returns for any of the years 1946 through 1949. Some time prior to December 31, 1942, petitioner acquired the real estate known as Lot 8, Block 68, School Addition, Batesville, Arkansas, for a consideration of $1,000. By deed dated October 12, 1946, petitioner sold Lot 8, Block 68, School Addition, to C.E. and Elsie B. James for a consideration of $3,250. This sum was deposited in the E. C. Rider account at the First National Bank of Batesville on October 18, 1946. Depreciation *176 totaling $303.75 was allowed or allowable on this property prior to its sale. The deposit was credited to the account receivable of petitioner in the E. C. Rider, Consignee, The Texas Company, books. The receipt of this money was not reported in the Federal income tax return petitioner filed for the calendar year 1946. On August 26, 1946, petitioner sold a horse and a jackass to Eagle Street for the sum of $400. Payment was made by check. Petitioner reported no receipts whatsoever from the sale of horses and/or jackasses in the Federal income tax return he filed for 1946. On October 15, 1946, petitioner sold a group of yearling cattle to Brown Flowers for the sum of $4,092.75. Payment for these cattle was made by check drawn payable to petitioner and by him endorsed. On October 16, 1946, petitioner deposited $1,167.62 out of this check in the E. C. Rider account at the First National Bank of Batesville. The deposit slip under which the $1,167.62 was deposited shows the following: Check on Tenn.
$4,092.75
Less Note
2,023.31
$2,069.44
Less Cash
792.25
$1,277.19
Less J. Shaver
109.57
$1,167.62
On his 1946 Federal income tax return, petitioner reported *177 receipts from the sale of cattle raised of $1,436. Petitioner reported no receipts whatsoever from the sale of livestock purchased. By a timber deed dated January 24, 1947, petitioner conveyed to J. H. Hamlin and Son, in consideration of $2,000, rights to cut and remove all timber then standing on approximately 1,300 acres of his 3,000-acre farm in Independence and Sharp Counties, Arkansas, provided same be cut and removed from said premises on or before February 1, 1948. This $2,000 was paid by Hamlin's check dated January 24, 1947, in the amount of $2,000 drawn payable to petitioner which check was deposited in the E. C. Rider account at the First National Bank at Batesville, on January 27, 1947. The amount of $2,000 was credited to the account receivable for petitioner in the E. C. Rider, Consignee, The Texas Company, books, was not included in any profit and loss account in petitioner's books, and was not reported by him in the Federal income tax return he filed for the calendar year 1947. On or about June 27, 1947, petitioner, through the Rider Motor Company, sold three new 1947 Ford automobiles to the Board of Pardons, Probations and Paroles of the State of Arkansas for the *178 total sum, exclusive of Federal excise taxes, of $4,081. Of this sum $975 was paid in cash, and three used cars were taken in trade for the balance of $3,106. The three used cars taken in trade were never recorded in the used car inventory of Rider Motor Company. On July 8, 1947, the three used cars were sold to W. N. Ball and Son for the total sum of $4,700. Ball issued five checks drawn payable to Rider Motor Company in payment for these cars. The checks were in the amounts of $1,600, $1,000, $1,000, $1,000, and $162.37. The three checks for $1,000 were endorsed Rider Motor Company by rubber stamp and, together with petitioner's own check for $106, were deposited in the Rider Motor Company account at the First National Bank of Batesville on July 8, 1947. The sale of the new cars to the State of Arkansas was recorded on the books of Rider Motor Company by debiting Deals in Transit and crediting Sales. When Ball's checks totaling $3,000 and petitioner's check for $106 were deposited in the Rider Motor Company account, an entry was made on the books of Rider Motor Company debiting Cash and crediting Deals in Transit for $3,106. When, on July 19, 1947, the State of Arkansas paid the *179 $975, an entry was made on the books debiting Cash and crediting Deals in Transit for $975. The check for $1,600 received from Ball was endorsed Rider Motor Company and and also by petitioner and deposited in petitioner's personal account at the First National Bank of Batesville on July 8, 1947. This $1,600 was never recorded in any income account in petitioner's books and records and was never reported as income on petitioner's Federal income tax returns. On September 26, 1947, petitioner sold a group of calves to Brown Flowers for the total sum of $8,869.30. Flowers paid for the cattle by check drawn payable to petitioner and endorsed by him. On September 26, 1947, petitioner deposited $7,869.30 of this amount in the First National Bank of Batesville. The deposit slip showed the following: Check on Newbern, Tennessee
$8,869.30
Less
1,000.00
$7,869.30 In his Federal income tax return for the calendar year 1947, petitioner reported receipts from the sale of cattle raised of $7,740 and no receipts from the sale of cattle or other livestock purchased. In his Federal income tax return for the calendar year 1948, petitioner reported medical expenses totaling $20,000. *180 Petitioner actually expended $10,000 for medical expenses in 1948. On March 2, 1949, the Texas Eastern Transmission Company, Inc. issued its check payable to E. C. Rider in the amount of $1,146.90. The check was in payment for water purchased by Texas Eastern through E. C. Rider, Consignee, The Texas Company, at Bald Knob, Arkansas. Of this amount, $500 was deposited into petitioner's personal account at the First National Bank of Batesville on March 7, 1949. The deposit slip showed the following: Check on La.
$1,146.90
Less
646.90
$ 500.00
On June 1, 1949, the Memphis Anglia-Prefect Dealers Advertising Fund paid petitioner $961.08. This payment was a refund of prepaid advertising expenses collected at the rate of $20 per English car sold to petitioner. The $20 per car was included in the price Rider Motor Company paid on its purchase of the cars. On June 1, 1949, the check was deposited in petitioner's personal account at the First National Bank of Batesville. The receipt of this money was never recorded in any income account on the books and records of any of petitioner's businesses. On October 4, 1946, an entry was made in the books and records of Rider *181 Motor Company debiting petitioner's investment account with livestock in the amount of $3,702.50 and crediting the livestock account of Rider Motor Company with the same amount. This entry constituted a technical adjustment to the Rider Motor Company books and did not reflect an actual transfer of livestock. The depreciation sections of the farm schedules attached to petitioner's Federal income tax returns for the calendar years 1944 through 1947 reflect that petitioner acquired and continued to own through December 31, 1947, breeding animals that he had acquired in the years and at the acquisition costs below indicated, and upon which he claimed depreciation expense at the rates below indicated: Acquisi-
Acquisi-
tion
tion
Annual
Animals
Date
Cost
Depreciation
3 bulls
1943
$1,900
25%
4 bulls
1944
1,550
25%
40 cows
1942
3,400
10%
20 cows
1943
1,700
10%
The depreciation sections of the farm schedules attached to petitioner's Federal income tax returns for the calendar years 1944 and 1945 reflect that petitioner acquired and sold additional breeding animals in the years and at the acquisition costs and sales prices indicated below, *182 and upon which petitioner had claimed allowable depreciation expense prior to sale as indicated below: Acquisition
Acquisition
Sales
Sales
Depreciation
Animals
Date
Cost
Date
Price
Prior to Sale
20 cows
1940
$1,700
1945
$1,300
$680
20 cows
1941
1,700
1945
1,300
510
20 cows
1942
1,700
1945
1,300
340
No jackasses, stallions or breeding mares were claimed as depreciable farm animals on any of the Federal income tax returns filed by petitioner for the calendar years 1944 through 1949. By an instrument dated September 22, 1948, petitioner and his wife entered into a contract of sale of some 3,000 acres of his farm land to John J. Gassner and wife. The land which was the subject of this contract had been acquired by petitioner by the following cumulative expenditures, exclusive of any expenditures for postacquisition improvements, on the dates indicated below: Date
Amount
12/31/42
$10,481.44
12/31/43
12,481.44
12/31/44
12,481.44
12/31/45
13,206.44
12/31/46
13,286.44
12/31/47
13,286.44
12/31/48
13,286.44 As of December 31, 1948, the total cost of the land to petitioner was $13,286.44. The contract *183 of sale between petitioner and the Gassners provided as follows: "CONTRACT FOR SALE OF LANDS "This contract and agreement made and entered into this the 22nd day of September, 1948, by and between E. C. Rider and Nettie M. Rider, his wife, as Parties of the First Part, and John J. Gassner and Lucille C. Gassner, his wife, as Parties of the Second Part, Witnesseth: "Party of the first part hereby agrees to sell to parties of the second part, and parties of the second part agree to purchase from parties of the first part, the following described lands situated in Independence County and Sharp County, Arkansas, to-wit: 3,000 acres, more or less, of lands situated in Dota Township, Independence County, Ark., and in Sharp County, Arkansas, lying contingent, and described in attached List of Bee Vanemburg, Real Estate Agent as No. 34; it being further understood and agreed that a complete legal description of the lands will be later prepared and attached hereto. "Such sale and purchase to be upon the following terms and conditions: "1. Parties of the Second Part agree to pay therefor the sum of $26,500.00, to be paid as follows: The sum of $1,000.00 cash upon the execution of *184 this agreement and the execution of a note in the amount of $5,500.00 payable on or before six months after date, bearing interest from date until paid at the rate of 5% per annum, said note for $5,500.00 to be secured by a Chattel Mortgage upon a certain Buick Fordoor Sedan described more particularly in said Chattel Mortgage; upon payment of the full sum of $6,500.00, being the total of the cash payment and deferred payment above, Parties of the First part agree to execute and deliver to said Parties of the Second Part a Bond for Title to said lands, conditioned that upon the payment in full of the balance of the purchase price as hereinafter set out, the Parties of the First Part will execute and deliver to parties of the Second Part a Warranty Deed to said lands with an abstract of title to said lands showing a vaiid title in Parties of the First Part. "The Bond for Title shall provide for the payment of the sum of $1,000.00 one year after the date of said Bond for Title, and the Sum of $2,000.00, the second, third, fourth, fifth, sixth, seventh, eighth and ninth years after date of said Bond for Title, and the sum of $3,000.00 ten years after the date of said Bond for Title, *185 all of said payments to bear interest from date of said Bond for Title at the rate of 5% per annum, interest payable annually on unpaid balance, provided all or any part of the unpaid balance may be paid at any time prior to maturity. "Parties of the First Part agree to accept said sum payable as aforesaid as the full purchase price for said lands, and agree that upon the final payment of all the sums provided for under this contract and Bond for Title, in the time and manner aforesaid, to execute and deliver to said Parties of the Second Part a Warranty Deed to said lands with abstract of title as aforesaid; and each of said parties hereby bind themselves, their heirs, administrators and executors to the full compliance of this agreement. "It being understood that there is an outstanding timber conveyance covering the merchantable timber lying east of the WPA road running thru said lands, which will expire in March 1949 and this contract and sale is made subject to such conveyance. "In Witness Whereof, the several parties have hereunto set their hands and seals on this the date first mentioned above." On or about September 22, 1948, Gassner paid petitioner $1,000 pursuant *186 to the foregoing contract and this amount was deposited in the petitioner's personal account at the First National Bank of Batesville on that date. On or about March 10, 1949, Gassner paid petitioner an additional $5,500 pursuant to said agreement. As of December 31, 1949, Gassner owed petitioner $20,000 of the sales price of $26,500. Bee Vanemburg, a real estate agent at Batesville, Arkansas, handled the sale of petitioner's lands to the Gassners. Petitioner's check dated March 24, 1949, drawn payable to Bee Vanemburg in the amount of $1,500, was endorsed by Vanemburg and perforated paid on March 25, 1949. Prior to December 31, 1942, petitioner expended $2,000 in clearing part of his 3,000-acre farm. He expended an additional $1,000 in 1943 and an additional $1,000 in 1945 for the same purpose. The depreciation sections of the farm schedules attached to petitioner's income tax returns for the calendar years 1944 through 1947 reflect that petitioner owned farm buildings that he had acquired in the years and at the depreciable bases indicated below, and upon which he claimed depreciation at the rates indicated below. Acqui-
Annual
sition
Depreci-
Depre-
Improvement
Date
able Bases
ciation
1 farm house
1939
$1,000
5%
1 farm house
1943
750
5%
1 barn
1938
1,500
5%
1 barn
1940
2,000
5%
*187 No other farm buildings or improvements were claimed on petitioner's Federal income tax returns for the calendar years 1944 through 1949. In 1941, petitioner expended $6,444 for posts, woven wire and labor in fencing the 3,000-acre farm. These fences were depreciable at the rate of 10% per year. The depreciation sections of the farm schedules attached to petitioner's Federal income tax returns for the calendar years 1944 and 1946 reflect that prior to January 1, 1946, petitioner had recovered his depreciable bases in the following farm machinery and equipment which he had acquired in the years and at the acquisition costs indicated below, and upon which he had claimed depreciation at the rates indicated below: Acqui-
Annual
sition
Acquisi-
Depre-
Machine
Date
tion Cost
ciation
Tractor
1940
$ 700
25%
Tractor
1941
900
25%
Rotary Fresno
1942
575
33 1/3%
Hydraulic Scoop
1942
475
33 1/3%
The depreciation sections of the farm schedules attached to petitioner's Federal income tax returns for the calendar years 1944 through 1947 reflect that petitioner acquired and continued to own through December 31, 1947, farm machinery and equipment *188 not fully depreciated prior to January 1, 1946, and that he had acquired such machinery and equipment in the years and at the acquisition costs indicated below, and had claimed allowable depreciation expense at the rates indicated below: Acqui-
Annual
sition
Acquisi-
Depre-
Machine
Date
tion Cost
ciation
Binder
1943
$ 500
25%
Letz Mill
1943
600
16 2/3%
Other Machinery
1940
1,500
10%
No other depreciable farm equipment or machinery was claimed on petitioner's Federal income tax returns for the calendar years 1944 through 1949. In early 1951, an agent of respondent commenced an examination of petitioner's income tax liability for the period 1943 through 1949. The agent spent a total of 20 days and six hours in this investigation. In his Federal income tax return for the year 1943, petitioner claimed farm expenses totaling $14,238.50. The books and records [1] of petitioner revealed a total expenditure for farm expenses in 1943 of no more than $2,926.77. *189 In his Federal income tax return for the year 1944, petitioner claimed farm expenses totaling $10,232.50. The books and records of petitioner revealed a total expenditure for farm expenses in 1944 of no more than $9,090.21. In his Federal income tax return for the year 1945, petitioner claimed farm expenses totaling $15,864.30. The books and records of petitioner revealed a total expenditure for farm expenses in 1945 of no more than $4,985.05. In his Federal income tax return for the year 1946, petitioner claimed deductions for "General Expense" of $7,200 and "Attorney Fees" of $1,350. The books and records of petitioner revealed no such expenditures whatsoever in 1946. In his Federal income tax return for the year 1947, petitioner claimed farm expenses totaling $14,950 and deductions for "General Expenses of Travel and Entertainment" in the amount of $7,200, "Attorney Fees" in the amount of $2,400, and "Commissions" in the amount of $1,800. The books and records of petitioner revealed a total expenditure for farm expenses in 1947 of no more than $7,267.79, expenditures for "General Expenses of Travel and Entertainment" in 1947 of no more than $600, and no expenditures whatsoever *190 in 1947 for "Attorney Fees" or "Commissions." In his Federal income tax return for the year 1948, petitioner claimed farm expenses totaling $12,551.64, deductions for "Expense of Managing Business" in the amount of $7,200, and "Attorney Fees" in the amount of $2,400. The books and records of petitioner revealed a total expenditure for farm expenses in 1948 of no more than $4,246.18, expenditures in 1948 for "Expenses of Managing Business" of no more than $371.39, and no expenditures whatsoever in 1948 for "Attorney Fees." In his Federal income tax return for the year 1949, petitioner claimed deductions for "Pilot and Chauffeur Expenses and Entertainment" in the amount of $7,200, "Attorney Fees" in the amount of $1,906.70, and "Commissions" in the amount of $840. The books and records of petitioner revealed no such expenditures whatsover in 1949. Petitioner realized a long-term capital gain of $1,213.49 in 1943 on the liquidation of Batesville Motor Company. This gain was not reported by petitioner in any Federal income tax return. Petitioner realized a long-term capital gain of $550 in 1944 on the sales of Lots 11 and 12, Block 3, Maxfield Addition, Batesville, Arkansas. This *191 gain was not reported by petitioner in any Federal income tax return. Petitioner realized income of $1,156.63 in 1944 from the sale of hogs. This income was not reported by petitioner in any Federal income tax return. Petitioner realized a long-term capital gain of $2,350 in 1946 from the sale of Lot 4, Block 1, Highland Addition, Batesville, Arkansas. This gain was not reported by petitioner in any Federal income tax return. Petitioner realized a long-term capital gain of $1,300 in 1946 from the sale of Lot 5, Block 67, School Addition, Batesville, Arkansas. This gain was not reported by petitioner in any Federal income tax return. Petitioner realized a long-term capital gain of $2,553.75 in 1946 on the sale of Lot 8, Block 68, School Addition, Batesville, Arkansas. This gain was not reported by petitioner in any Federal income tax return. Petitioner realized income of $4,092.75 in 1946 on the sale of cattle he had raised. Petitioner reported $1,436 income from the sale of cattle raised in his Federal income tax return for 1946. Petitioner realized a long-term capital gain in 1947 on the sale of timber to J. H. Hamlin and Son. No gain whatsoever was reported by petitioner *192 in his Federal income tax return for 1947. Petitioner realized income of $1,494 in 1947 on the sale to W. N. Ball and Son of three 1946 Ford automobiles received as trade-ins on three 1947 Ford automobiles sold to the Board of Pardons, Probations and Paroles of the State of Arkanas. This income was not reported by petitioner in any Federal income tax return. Petitioner realized income of $8,869.30 in 1947 on the sale of cattle he had raised. Petitioner reported $7,740 income from the sale of cattle raised in his Federal income tax return for 1947. Petitioner realized income totaling $1,146.90 in 1949 on water sold and delivered to Texas Eastern Transmission Company, Inc. This income was not reported by petitioner in any Federal income tax return. Petitioner realized income of $961.08 in 1949 on a rebate of advertising expenses paid through Rider Motor Company. This income was not reported by petitioner in any Federal income tax return. Petitioner's sale of his 3,000-acre farm was consummated and became a completed, closed, and taxable transaction in 1949, in which year he realized a long-term capital gain of $3,549.76 computed as follows: Sales Price
$26,500.00
Less: Commission
1,500.00
$25,000.00
Less: Basis
Initial Costs
$28,980.44
Depreciation
7,530.20
21,450.24
Gain Realized
$ 3,549.76
*193 Petitioner's assets, liabilities, net worth, and increase in net worth as of the end of the years 1943 through 1949, inclusive, were as follows: E. C. RIDER - NET WORTH STATEMENTS
ASSETS
12/31/42
12/31/43
12/31/44
12/31/45
Assets not in dispute
$54,382.70
$ 71,108.60
$ 84,430.70
$112,495.23
City real estate
5,375.00
5,375.00
4,875.00
4,875.00
Farm improvements
12,944.00
14,694.00
14,694.00
15,694.00
Farm machinery & equipment
4,150.00
5,250.00
5,250.00
4,550.00
Livestock
Farm breeding stock
8,500.00
12,100.00
13,650.00
8,550.00
3,000-acre farm
Total Assets
$85,351.70
$108,527.60
$122,899.70
$146,164.23
LIABILITIES
Accounts payable - J. J.
Glassner
Reserves for depreciation: City real estate
$ 1,705.00
$ 1,925.00
$ 2,145.00
$2,365.00
Farm improvements
2,088.80
2,995.70
3,902.60
4,809.50
Farm machinery & equipment
1,025.00
2,149.84
3,275.42
3,525.00
Farm breeding stock
850.00
2,345.00
4,225.00
4,065.00
Liabilities not in dispute
200.00
Total Liabilities
$ 5,668.80
$ 9,415.54
$ 13,548.02
$ 14,964.50
Net worth
$79,682.90
$ 99,112.06
$109,351.68
$131,199.73
Beginning net worth
79,682.90
99,112.06
109,351.68
Increase in net worth
$ 19,429.16
$ 10,239.62
$ 21,848.05
Add: Nondeductible
6,464.67
4,672.52
5,596.17
expenditures
Total
$ 25,993.83
$ 14,912.14
$ 27,444.22
Less: Nontaxable income
606.74
275.00
165.00
Net income corrected
$ 25,287.09
$ 14,637.14
$ 27,279.22
Net income per return (Loss)
(6,217.59)
121.88
7,321.45
Unreported income
$ 25,287.09
$ 14,515.26
$ 19,957.77
*194 E. C. RIDER - NET WORTH STATEMENTS
ASSETS
12/31/46
12/31/47
12/31/48
12/31/49
Assets not in dispute
$162,396.47
$207,793.36
$237,228.86
$287,280.48
City real estate
125.00
225.00
225.00
2,975.00
Farm improvements
15,694.00
15,694.00
15,694.00
Farm machinery & equipment
2,600.00
2,600.00
Livestock
3,702.50
Farm breeding stock
8,550.00
8,550.00
3,000-acre farm
13,286.44
Total Assets
$193,067.97
$234,862.36
$266,434.30
$290,255.48
LIABILITIES
Accounts payable - J. J.
$ 1,000.00
Glassner
Reserves for depreciation: City real estate
Farm improvements
$ 5,716.40
$ 6,623.30
7,530.20
Farm machinery & equipment
1,950.00
2,200.00
Farm breeding stock
5,435.00
6,330.00
Liabilities not in dispute
602.81
1,408.43
493.36
$ 966.89
Total Liabilities
$ 13,704.21
$ 16,561.73
$ 9,023.56
$ 966.89
Net worth
$179,363.76
$218,300.63
$257,410.74
$289,288.59
Beginning net worth
131,199.73
179,363.76
218,300.63
257,410.74
Increase in net worth
$ 48,164.03
$ 38,936.87
$ 39,110.11
$ 31,877.85
Add: Nondeductible
8,021.93
18,680.69
20,522.99
2,538.03
expenditures
Total
$ 56,185.96
$ 57,617.56
$ 59,633.10
$ 34,415.88
Less: Nontaxable income
1,526.87
1,175.00
1,774.88
Net income corrected
$ 54,659.09
$ 56,442.56
$ 59,633.10
$ 32,641.00
Net income per return (Loss)
18,842.54
28,004.34
7,755.81
20,628.75
Unreported income
$ 35,816.55
$ 28,438.22
$ 51,877.29
$ 12,012.25
*195 Petitioner realized and failed to report taxable income for the calendar years 1943 through 1949 as follows: Unreported
Unreported
Year
Income
Year
Income
1943
$25,287.09
1947
$28,438.22 *
1944
14,515.26
1948
51,877.29 *
1945
19,957.77
1949
12,012.25 *
1946
35,816.55
Part of the deficiencies for each of the years 1943 through 1949 was due to fraud with intent to evade tax. Petitioner, E. C. Rider, filed a false or fraudulent Federal income or income and victory tax return with intent to evade tax for each of the years 1943 through 1946 and assessment and collection of deficiencies for such years are not barred by the statute of limitations. Opinion The first issue is whether respondent correctly determined deficiencies against petitioner for each of the years 1943 through 1949. Petitioner contends that the records of petitioner's various businesses coupled with the records *196 of deposit of funds in his personal account are adequate for purposes of determining his taxable income. This argument is without merit. Petitioner admittedly had no records of his farm operation because, as he testified, they had been stolen and destroyed. In any event, it is well settled that even where books and records appear on their face to be adequate respondent is not precluded from resorting to the net worth method of computing income. Holland v. United States, 348 U.S. 121, rehearing denied, 348 U.S. 932; Davis v. Commissioner, 239 F. 2d 187, affirming a Memorandum Opinion of this Court, certiorari denied 353 U.S. 984; Baumgardner v. Commissioner, 251 F.2d 311, affirming a Memorandum Opinion of this Court. Petitioner admits that he had increases in net worth in excess of reported income in all but one of the years involved. He seeks to explain these increases by attributing them to gifts from his wife's uncle. Suffice it to say that we are not convinced that petitioner was the recipient of such gifts as he contends. Indeed, the record is bereft of any reasonable explanation of such discrepancies. As suggested *197 in Holland v. United States, supra, books and records may be "more consistent than truthful," and where, as here, there is a showing of a substantial increase in net worth in excess of reported income, without reasonable explanation of such discrepancy, the net worth method reflects on the overall accuracy of income reported on the books and on the returns. The net worth method is not itself a system of accounting but merely a technique for reconstructing a taxpayer's correct net income. Michael Potson, 22 T.C. 912, affd. sub nom. Bodoglau v. Commissioner, 230 F. 2d 336; Estate of George L. Cury, 23 T.C. 305; Morris Lipsitz, 21 T.C. 917, affd. 220 F. 2d 871, certiorari denied 350 U.S. 845; Harry Gleis, 24 T.C. 941, affd. 245 F. 2d 237. Further, petitioner contends that respondent erroneously computed his net worth in each of the years involved. This argument is based upon the alleged failure of respondent to allow petitioner the proper amount in the operating net worth, and in subsequent years, for certain assets. The particular assets involved, the amount determined *198 by respondent and the amount claimed by petitioner, in the opening net worth, are as follows: Value Deter-
Value
mined by
Claimed by
Asset
Respondent
Petitioner
Farm Improvements
$10,944
$108,994.00
Farm Machinery &
Equipment
1,500
18,900.00
Cattle
20,140.00
Farm Breeding Stock
8,500
20,750.00
Horses, etc.
13,075.00
Personal Items
15,334.50
On brief, respondent concedes Farm Improvements to be $12,944 and Farm Machinery and Equipment to be $4,150 on December 31, 1942. Respondent's determination is presumptively correct and the burden is upon the petitioner to overcome this presumption. Frank Imburgia, 22 T.C. 1002. Petitioner has fallen far short of meeting his burden. The disputed assets will be discussed item by item. Personal Items. Petitioner contends that as of December 31, 1942, he owned the following personal items for which he was not given credit by respondent: 9 Saddles, one silver
$ 2,495.00
Farm Feeds and Minerals
6,139.50
Boat and Boathouse
5,000.00
Guns
1,700.00
Total
$15,334.50
Assuming, without deciding, that petitioner had these assets on December 31, 1942, the record does *199 not establish and petitioner has not even contended that he sold or otherwise disposed of these items during the years in issue, with the exception of the Farm Feeds and Minerals. Petitioner contends that the Farm Feeds and Minerals were sold with the farm. With regard to the other items, retention of these assets through December 31, 1949, would at best require only the same addition to net worth for each year and would not affect the increases in net worth determined by respondent. With regard to the Farm Feeds and Minerals, since petitioner reported his farm income on the cash basis, he would have no basis in any feed he had raised on the farm and none in any feed purchased because such purchases would be allowed as expenses when paid for. It follows that respondent did not err in not including any Personal Items in the net worth computations. Farm Improvements. Petitioner contends that he should have been allowed $108,994 in the opening net worth and in subsequent years for improvements to his farm. Respondent determined that the proper value of the improvements on petitioner's farm on December 31, 1942, was $10,944, which was increased to $12,944 by respondent on brief. The *200 parties stipulated the cost of the land itself to petitioner at $10,481.44 on December 31, 1942, increasing to $13,286.44 by 1948. At the outset, it might be sufficient to simply say that it is impossible to accept the proposition that petitioner sold, for a price of $26,500 in 1948, a farm which had cost him $13,286.44 for the land and on which he had expended $108,944 for improvements. Such an argument taxes our credulity. However, the inherent improbability of this circumstance is not the only indication that the values contended for by petitioner are incorrect. Petitioner submitted a document to agents of the respondent in which he set forth that the improvements on the farm and the cost thereof were as follows: Woven Wire Fencing, 11 1/2 miles
$ 1,472.00
Barb Wire, 92 Rolls
552.00
Cedar Posts
1,320.00
Labor
600.00 1 Barn, 140foot X 60foot
4,000.00 1 Barn, 120foot X 60foot
3,000.00
1 Four Room House
1,800.00
Clearing 160 Acres
5,000.00
Total
$17,744.00
Other Expense for Building Roads, 3
Bridges, Levying, 11 Ponds,
and 4 miles extra wire fence
15,000.00
Total
$32,744.00
Credit Timber Sold
5,000.00
$27,744.00
*201 In this document, which was dated June 30, 1955, petitioner asserted that the land itself had cost him $15,768, yet he later stipulated the correct amount to be $13,286.44. In his Federal income tax return for the year 1944, which was the first return in evidence containing a farm schedule, petitioner claimed, for depreciation purposes, the following farm improvements and no others: Date Ac-
Cost or
Property
quired
Other Basis
1 Frame House
1939
$1,000.00
1 Frame House
1943
750.00
1 Frame Barn
1938
1,500.00
1 Frame Barn
1940
2,000.00
Total
$5,250.00
It will be noted that $750 of the above total represents a house acquired in 1943 and would not be included in the opening net worth. Petitiomer's explanation of the discrepancy arising from the farm improvements listed for depreciation purposes is that the only listed for depreciation purposes those improvements that he had paid for out of his own funds; that the balance of the improvements claimed were paid for by his wife's uncle and, therefore, he did not claim such improvements for depreciation. There is no attempt to explain the discrepancies arising out of the document submitted to *202 respondent's agents. In the light of all of the evidence, we discern no reason to disturb the determination of the respondent as corrected on brief. The respondent's determination of the value to be assigned to farm improvements, as corrected on brief, for each of the years in issue is sustained. Farm Machinery and Equipment. Petitioner contends that he had, as of December 31, 1942, farm machinery and equipment which cost him $18,900. The respondent determined that on December 31, 1942, petitioner had such assets which cost him $1,500, which was increased to $4,150 on brief. The net worth computation of respondent on brief includes all of the farm machinery and equipment upon which petitioner claimed depreciation on the farm schedules of his Federal income tax returns for the years 1944 through 1949. Farm machinery and equipment upon which depreciation was claimed in 1943, 1944 or 1945 but not thereafter, and which was not reported by petitioner in his returns as having been sold prior to 1948, has been included in the net worth computations until fully depreciated in accordance with the acquisition dates and rates of depreciation claimed on the returns. Any other machinery that *203 was fully depreciated prior to 1943 was properly omitted from the computations. On his 1944 Federal income tax return, petitioner listed the following farm machinery and equipment: Date Ac-
Cost or
Property
quired
Other Basis
1 Tractor
1941
$ 900.00
1 Tractor
1940
700.00
1 Binder
1943
500.00
1 Letz Mill
1943
600.00
1 Rotary Fresno
1942
575.00
1 Hydraulic Scoop
1942
475.00
All Other Machinery
1940
1,500.00
Total
$5,250.00
From a consideration of all the evidence, we are convinced that if petitioner had any unrecovered basis in any other farm machinery and equipment during the years in issue here, he would have claimed same for depreciation. The determination of respondent as corrected on brief with regard to the farm machinery and equipment is sustained. Cattle - Farm Breeding Stock. Petitioner contends that as of December 31, 1942, he had cattle, other than farm breeding stock, which should be valued at $20,140 in the opening net worth, and that he continued to own these cattle through 1947. Respondent determined that petitioner had no cattle aside from the farm breeding stock. Petitioner further contends that he had on December 31, 1942, farm *204 breeding stock which should be valued at $20,750 in the opening net worth. Respondent determined that the proper value of the farm breeding stock on December 31, 1942, was $8,500. The petitioner listed the following livestock for depreciation purposes in the farm schedule of his 1944 Federal income tax return: Date Ac-
Cost or
Property
quired
Other Basis
3 Bulls
1943
$1,900.00
4 Bulls
1944
1,550.00
20 Brood Cows
1940
1,700.00
20 Brood Cows
1941
1,700.00
80 Brood Cows
1942
6,800.00
20 Brood Cows
1943
1,700.00
Total
$15,350.00
In his Federal income tax return for the year 1945, petitioner listed the following livestock for depreciation purposes: Date Ac-
Cost or
Property
quired
Other Basis
3 Bulls
1943
$1,900.00
4 Bulls
1944
1,550.00
40 Cows
1942
3,400.00
20 Cows
1943
1,700.00
Total
$8,550.00
In the same return, petitioner reported the sale of livestock purchased as follows: Date Ac-
Gross
Cost or
Property
quired
Sales Price
Other Basis
20 Cows
1940
$1,300.00
$1,700.00
20 Cows
1941
1,300.00
1,700.00
20 Cows
1942
1,300.00
1,700.00
Petitioner's evidence *205 with regard to the cattle for which he contends was not convincing. In the first place, he introduced, as Exhibit 4, what purported to be a list of his cattle as of December 31, 1942. This list was as follows: Livestock, December 31, 1942
Full Blood Angus
60 cows
$20,750.00
11 bulls
Grade Cows, 190
20,140.00
It then developed that this list introduced had been prepared by counsel for petitioner from a typewritten list supplied by petitioner. Petitioner then introduced this latter list, as Exhibit 7, and testified that Exhibit 7 had been typed by his secretary from a handwritten list, subsequently destroyed, prepared by him from a day book. Later in his testimony, petitioner testified that his secretary had typed Exhibit 7 in 1948 and that the handwritten list she had copied from had been prepared a short time before the typing after an inventory conducted on the farm and that the handwritten list had then been destroyed. Petitioner later introduced still another list, as Exhibit 9, which purported to be a list of cattle and other farm assets prepared in 1942. Petitioner then testified that this list was the one which his secretary had used in preparing Exhibit *206 7. It is unclear from the testimony what the relationship of the various lists was. It is particularly baffling to note that Exhibit 7 contained details and assets not set forth at all in Exhibit 9. Considered as a whole, the evidence of petitioner with regard to the cattle is insufficient. The determination of respondent with regard to cattle owned by petitioner in each of the years in issue is sustained. Horses, etc. Petitioner contends that on December 31, 1942, he had horses, mares, stallions and jackasses on his farm as follows: 23 Horses and Mares
$ 8,275.00
2 Stallions
1,500.00
2 Jacks
1,550.00
3 Saddle Horses
1,750.00
Total
$13,075.00
Respondent did not include any of these items in his net worth computations. Petitioner's evidence with regard to these items was the same as that with regard to the cattle. Exhibit 5 introduced by petitioner was the purported list of these items. Aside from the defects of Exhibit 5 arising from the confusion in the origin of the list, petitioner never claimed any of these items for depreciation purposes in any of his Federal income tax returns for the years 1944 through 1949. Neither did petitioner ever report the *207 sale of any such items as these in the years from 1944 through 1947. There is also present here the fact that Exhibit 9 shows Horses, Mares, Stallions and Jacks totaling $11,325, whereas Exhibit 5, which was allegedly made up from Exhibit 9, shows such items as having a value of $13,075. There is no attempt to explain this discrepancy. The evidence of petitioner with regard to these items is not convincing. Respondent did not err in not including in the net worth computations the items of Horses, Mares, Stallions and Jacks claimed by petitioner. Further, with regard to the issue of whether respondent correctly determined deficiencies against petitioner for each of the years 1943 through 1949, petitioner contends that any increases in net worth in excess of reported income for each of the years in issue are attributable to gifts to petitioner from C. M. Edwards, the uncle of petitioner's wife. The evidence of petitioner in this regard consisted of his own testimony as to the gifts and the testimony of the vice president of the First National Bank of Batesville, Arkansas. The testimony of petitioner was vague and indefinite. He could recall no specific gifts, no specific amounts, no *208 specific dates, in fact, not a single detail with regard to these gifts. Petitioner testified that he had apparently unlimited authority to draw drafts on C. M. Edwards and that he did so from time to time, and that at the end of each year, C. M. Edwards would tear up the drafts he had drawn. Petitioner further testified that this arrangement was a secret because Edwards wanted it that way. Petitioner's testimony was incredible. The vice president of the bank, H. M. Kennerly, testified that he recalled petitioner drawing on Edwards but he related it to times when petitioner's own bank account was overdrawn in the 1930's. Kennerly could recall no specific drafts, no amounts, no dates and no details at all. The following testimony of Kennerly is illustrative: "The Witness: I would like to add a little to it. I realize that I am stating something that I cannot put my finger on and I wanted to make it a little more plainer. One reason I remember some of these transactions are that I was amazed at the confidence Mr. Edwards had in Mr. Rider. That has not happened too much in my banking experience and I remembered it. I remember that Mr. Edwards paid those drafts with the utmost confidence. *209 "The Court: What about the time, Mr. Kennerly? Can you pinpoint this in the matter of time any better than what you have? "The Witness: I remember it better, of course, more in detail when times were a little harder. "The Court: They were worse in the early 30's, were they not? "The Witness: Well, I said awhile ago it was the 30's that I remember so well. "The Court: Most of this activity then took place, or it is your recollection that it took place prior to 1940? "The Witness: Well, I remember those years better because Mr. Rider's finances were not quite as good then as they are now, and he does not overdraw like he used to. "The Court: I believe your testimony was, and I do not want to change anything, but I believe your testimony was that you do not have any specific recollection of this kind of transaction occurring after 1943 or after 1942? "The Witness: Of course, I could not know whether it occurred in 1943 or 1942. "The Court: If you can give us a dividing line, it may help us. "The Witness: I remember when times were hard and they were harder in the 30's. "The Court: Proceed. "Mr. Moore: I have no further questions." It is impossible to conclude *210 from the evidence that petitioner was the recipient of gifts sufficiently substantial to warrant a conclusion that the increases in net worth in excess of reported income came from that source. Finally, with regard to this issue, petitioner contends that the sale of his 3,000-acre farm became a completed, closed and tax-recognizable transaction during the calendar year 1948. The respondent has determined that the sale of the farm became a closed and tax-recognizable transaction in 1949. Petitioner's argument is that he entered into a contract of sale with the purchaser and turned the farm over to such purchaser in September, 1948. However, in a signed statement submitted to agents of the respondent, petitioner made the following assertions: "Farm sale contract with Jno. J. & Lucille C. Gassner, Sept. 22, 1948, for $26,500.00. Gassner moved onto farm Spring of 1949. Gassner contract sold and assigned by him to Burns Watling, March 1, 1950 and Watling took over farm sometime in 1950. Title finally approved and deed executed to Watling in 1952." In yet another sworn statement submitted to agents of the respondent petitioner made the following statement: "I, E. C. Rider, hereby *211 certify that a tentative contract for the sale of my farm lands was made in September 1948, with a contract of sale with agreement and bond for title made in March 1949, but that it was a year or more then before deal was finally closed and deeds executed." Actual delivery of possession is essential to the recognition of gain or loss in any year prior to that in which formal delivery of title is made by deed or similar instrument. United States Industrial Alcohol Co. v. Helvering, 137 F. 2d 511. See also, Lucas v. North Texas Co., 281 U.S. 11. The evidence reveals that Gassner did not pay the $5,500 which would entitle him to a bond for title until on or about March 10, 1949. Further, petitioner paid a $1,500 commission to the real estate agent who handled the sale on March 23, 1949. Although petitioner testified that Gassner took over the farm in September, 1948, his testimony is not convincing. Neither Gassner nor his wife testified. From a consideration of all the evidence, we are convinced that possession was not transferred by petitioner until some time after the payment of the $5,500 by Gassner in March, 1949. It follows from this that the sale *212 of the farm became a tax-recognizable transaction in 1949. We hold that petitioner has failed to overcome the presumptive correctness of respondent's determination as adjusted by our findings for each of the years in question. Accordingly, the deficiencies determined by respondent for the years 1943, 1944, 1945, and 1946, as adjusted by our findings, are sustained. In the years 1947, 1948, and 1949, no claim for increases in deficiencies having been filed by respondent, the deficiencies in the amounts determined by respondent for those years are sustained. Fraud. Respondent has determined additions to tax for fraud under section 293(b) of the Internal Revenue Code of 1939 for each of the years in question. The parties agree that assessment of deficiencies for the years 1943 through 1946 is barred unless the returns for those years were false or fraudulent with intent to evade tax within the meaning of section 276(a) of the Internal Revenue Code of 1939. The burden of proving fraud is upon the respondent. After a careful review of the present record, we are of the opinion that he has met that burden. In the first place, petitioner concedes that even if he were allowed the values *213 for the disputed assets for which he contends in the opening and subsequent net worth statements, he would nonetheless have increases in net worth in excess of reported income in the years and in the amounts as follows: Reported Income
Increase in
Year
or (Loss)
Net Worth
1943
($6,217.59)
$10,946.10
1944
121.88
8,707.30
1945
7,321.45
22,384.73
1946
18,842.54
46,615.63
1947
28,004.34
40,228.47
1949
20,628.75
22,078.09
These circumstances, of themselves, are strong evidence of fraud. M. Rea Gano, 19 B.T.A. 518; Abraham Galant, 26 T.C. 354; Albert N. Shahadi, 29 T.C. 1157, affd. 266 F. 2d 495, certiorari denied 361 U.S. 874; J. K. Vise, 31 T.C. 220, affd. - F. 2d - (C.A. 6, 5/19/60). Further, the respondent introduced evidence, and we have found as a fact, that petitioner failed to report specific items of income in the years and in the amounts as follows: Year
Amount
1943
$ 1,213.49
1944
1,706.63
1946
8,860.50
1947
2,623.30
1949
2,107.98
Total
$16,511.90
Even if every contention of petitioner with regard to the net worth statements *214 were sustained, there would remain the facts above set forth, that petitioner understated his income during 1943, 1944, 1946, 1947, and 1949 in the total amount of $16,511.90. The only explanation for these failures by petitioner was that he overlooked them. The consistency of the omissions and the amount involved serve to deny the explanation. Such a circumstance as this is, of itself, strong evidence of fraud. Albert N. Shahadi, supra. In addition to the admitted increases in net worth in excess of reported income and the failure to report specific items of income as established by respondent's evidence, the evidence presented by respondent further revealed that in each of the years here in issue, petitioner claimed farm expenses and/or various other deductions greatly in excess of the amounts reflected by his books and records, and in some years, specifically 1946, 1947, 1948, and 1949, there were items of deductions claimed by petitioner in his returns which were wholly unsupported by the books and records of petitioner. These overstatements of expenses and deductions are unexplained by petitioner except to the extent that he contends his farm records were stolen *215 and destroyed. However, even if the farm expenses claimed by petitioner are conceded to be correct, there were items of deductions in each of the years 1946 through 1949, unconnected with petitioner's farm operation, which lack substantiation, either wholly or partially, in his books and records. Such overclaiming of deductions is evidence of fraud. In Blackwell v. United States, 244 F. 2d 423, the Eighth Circuit Court of Appeals said: "A consistent pattern of underreporting large amounts of income or overclaiming deductions and not recording such items on the taxpayer's records is evidence from which willfulness may be inferred." Holland v. United States, supra, Zacher v. United States, 8 Cir. 227 F. 2d 219, 224; Canton v. United States, 8 Cir. 226 F. 2d 313, 321. See also Nathan Bilsky, 31 T.C. 35. In the recent case of J. K. Vise, supra, this Court said: "Further, we note that petitioners, by virtue of their present position, in effect concede understatements of net income in the approximate amounts of $12,226.83 for 1946, $5,989.48 for 1948, $1,843.11 for 1949, and $893.45 for 1951. Circumstances *216 such as this are strong evidence of fraud. Abraham Galant, 26 T.C. 354 (1956). In addition, petitioner realized a gain of $1,991.25 upon the sale of certain bonds during 1945, no part of which was reported. We are therefore confronted with understatements in each of the years 1945, 1946, 1948, 1949, and 1950 which are conceded or clearly proven but totally unexplained. "Discrepancies such as this, between actual net income and reported net income over a number of years, are further evidence of fraud, Holland v. United States, supra; Rogers v. Commissioner, 111 F. 2d 987 (C.A. 6, 1940), affirming 38 B.T.A. 16 (1938); Louis Halle, 7 T.C. 245 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949), certiorari denied 338 U.S. 949 (1950). "Further, we note we are not dealing with an individual entirely unfamiliar with the law and its requirements. Rather, petitioner is a man possessed of an above average education who has served in positions of public trust, and who presumably knew what was expected of him by his Government. "In the light of petitioner's background, and in the light of the record as a *217 whole, including but not limited to his failure to keep business records, his failure to cooperate with respondent's agents, the understatements of income in each of the years 1945, 1946, 1948, 1949, and 1950, we are convinced, and have found as a fact, that a part of the deficiencies for each of the years 1945 through 1951 was due to fraud with intent to evade tax." In the light of petitioner's background, and in the light of the record as a whole, including but not limited to petitioner's conceded increases in net worth in excess of reported income in each of the years 1943, 1944, 1945, 1946, 1947, and 1949, petitioner's failure to report specific items of income in each of the years 1943, 1944, 1946, 1947, and 1949, the overstatement of expenses and/or deductions in the years 1943 through 1949, and the absence of any records of the farm operation, we are convinced, and have found as a fact, that a part of the deficiencies for each of the years 1943 through 1949 was due to fraud with intent to evade tax, and that petitioner filed a false or fraudulent return for each of the years 1943 through 1946. Accordingly, we hold that petitioners are liable for the additions to tax imposed *218 by section 293(b) of the Internal Revenue Code of 1939, for each of the years involved, and that the assessment and collection of the deficiency and addition to tax for each of the years 1943 through 1946 are not barred by limitations. J. K. Vise, supra.
Decisions will be entered under Rule 50. Footnotes
*. Indicates individual figures per respondent's brief in error and corrected per returns. Respondent's brief reflects correct totals.↩
1. Petitioner informed respondent's agent that his farm records had been stolen and destroyed. Accordingly, no formal books and records regarding the farm operation were examined by respondent's agent. Insofar as the farm operation is concerned, the books and records referred to are limited to records of petitioner's bank account and canceled checks, and the books and records of petitioner's various other businesses which from time to time reflected transactions relating to the farm operation. Petioner maintained extensive records of all his other businesses and these records were examined by respondent's agent.↩
*. In the deficiency notices, respondent determined unreported income for the years 1947, 1948, and 1949 to be $28,355.74, $51,794.81 and $11,929.57, respectively. No claim for an increased deficiency has been filed by respondent for any of these years.↩