## J. K. VISE AND ANNIE D. VISE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59857. Filed October 27, 1958.

*W. H. Fisher, Esq.*, for the petitioners.
*Homer F. Benson, Esq.*, for the respondent.

TIETJENS, *Judge*: This proceeding involves deficiencies in income tax and additions thereto for the years and in the amounts set forth below.

| Petitioner | Year | Deficiency | Additions to tax | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Sec. 291 (a) | Sec. 293 (b) | Sec. 294 (d) (1) (A) | Sec. 294 (d) (2) |
| James K. Vise | 1945 | $2,006.56 | $501.64 | $1,003.28 | $200.66 | $120.39 |
| | 1946 | 5,172.61 | | 2,586.31 | 517.26 | 310.36 |
| | 1947 | 2,200.68 | | 1,100.34 | 220.07 | 132.04 |
| | 1948 | 3,398.56 | | 1,699.28 | 339.86 | 203.91 |
| | 1949 | 1,404.60 | | 702.30 | 140.46 | 84.28 |
| James K. and Annie D. Vise | 1950 | 922.66 | | 461.33 | 92.26 | 55.36 |
| | 1951 | 1,724.38 | | 862.19 | 164.34 | 98.60 |

The issues for decision are: (1) Whether petitioners had unreported income for the years 1945 through 1951 as determined by respondent through the use of the net worth plus personal expenditures method; and (2) if so, whether any part of the resulting deficiencies was due to fraud with intent to evade tax.

Some of the facts were stipulated.

#### FINDINGS OF FACT.

The stipulated facts are so found, and are incorporated herein by this reference.

James K. Vise (hereinafter referred to as the petitioner) resided in Memphis, Tennessee, during all the years in issue. For the year 1945 he filed no Federal income tax return. For the years 1946 through 1948, he filed individual Federal income tax returns. For the years 1949 through 1951, he filed joint Federal income tax returns with his wife, Annie D. Vise, whom he married during 1949. All returns were filed with the collector of internal revenue for the district of Tennessee.

Petitioner was born and raised in the town of Decaturville, Tennessee. He is a graduate of Columbia University located in New York City. He has served two terms as County Superintendent of Education for Decatur County, Tennessee, and one term as senator in the Tennessee State Legislature.

During the years in issue, petitioner realized substantial amounts of income from various sources, including a mercantile business, the purchase at discount of first and second mortgage notes secured by real estate, the collection of rents and interest, and investments in certain securities.

In 1944, petitioner's former wife, Grace Vise, obtained an absolute divorce from petitioner by decree of the Chancery Court of Decatur County, Tennessee. In conjunction with that proceeding she alleged that petitioner owned, among other assets, the sum of $8,000 cash maintained in a safe-deposit box in the American National Bank of Nashville, and 8 bales of cotton held in a warehouse located at Jackson, Tennessee. In reply to those allegations, petitioner alleged that his net worth as of October 3, 1944, was $17,451.69, comprised in part of $8,000 cash in American National Bank of Nashville; 6 bales of cotton located at Jackson compress valued at $540, being 8 bales less rent due; 26 bales of cotton located at Decaturville belonging to others than the petitioner and therefore having no value to him; and household goods valued at $3,000. Among his liabilities petitioner claimed the sum of $3,500 representing store accounts payable.

At the close of 1944, petitioner held in a safe-deposit box in the American National Bank of Nashville certain State and county bonds bearing matured interest coupons in the amount of $398.50. Petitioner was unable to gain access to those coupons to present them for payment until sometime in 1945 due to an attachment of his assets incident to the divorce proceedings commenced against him in September of 1944.

In August of 1945, petitioner's brother-in-law, W. O. Thompson, a cotton buyer in Lexington, Mississippi, acknowledged receipt from petitioner of 22 bales of cotton. On February 10, 1954, Thompson wrote petitioner in response to an inquiry from him, that he had remitted petitioner the sum of $1,850.72 in payment for cotton purchased. On November 7, 1945, petitioner deposited in his account

with the First Natitonal Bank of Memphis the amount of $1,850.72.

During 1942, petitioner purchased from the bond department of the First National Bank of Memphis 20 bonds of the State of Arkansas in the face amount of $1,000 each, at a cost of $100.500 per hundred dollars of face value. On November 15, 1945, that bank repurchased from petitioner 10 of those bonds for $119.9125 per hundred dollars of face value exclusive of interest.

In the latter part of 1945, petitioner moved to Memphis. Shortly thereafter he became engaged in the mortgage note business. His practice was to purchase bearer notes secured by real estate located within the Memphis area at discounts ranging from 10 to 62 per cent of their face amount. The average discount secured by petitioner was 25 to 30 per cent of the face value. In addition to collection of principal on those notes, petitioner received interest on their undiscounted face amount at 6 per cent per annum. The parties have agreed that petitioner's investments in those notes for the years in issue were in the following amounts:

| 1945 | 1946 | 1947 | 1948 | 1949 | 1950 | 1951 |
|---|---|---|---|---|---|---|
| $33,483.42 | $67,924.86 | $62,291.71 | $66,864.71 | $55,243.43 | $58,485.09 | $60,630.52 |

Petitioner was first contacted by respondent's agents early in 1950. In response to a request to furnish records of his business transactions, he produced some canceled checks and bank deposit records which were the only records he maintained with respect to his mercantile business. He also produced a few canceled checks dealing with his mortgage note transactions. Repeated requests were made for more complete records of his mortgage note business, to which petitioner consistently replied it was all a matter of public record. From a search of public records, and a study of the canceled checks furnished them, respondent's agents attempted to reconstruct petitioner's income from his mortgage note transactions. However, because the notes in which petitioner dealt were bearer notes, the public records in many instances revealed only the names of the original parties to the transaction. Certain leads were obtained from those records which subsequently established petitioner to be the owner of the notes under investigation. A contact of known individuals with whom petitioner transacted mortgage note business proved inconclusive. From their investigation, respondent's agents were able to discover approximately 75 separate note transactions in which petitioner was involved during the years in issue. In either July or August of 1952, petitioner furnished respondent's agents with a list of his note transactions for the years in issue which he had reconstructed from his own sources. That list disclosed some 87 separate note transactions.

On the ground that petitioner's records were incomplete, respondent's agents proceeded to reconstruct petitioner's income on the basis

of increases in his net worth plus his personal living expenditures, abandoning their original reconstruction which had been founded on the specific items basis. A net worth statement was prepared disclosing the receipt of income in excess of that reported for each of the years in issue. Concessions with respect to many of the items on that statement have been made by petitioner. Set forth below are the amounts of net income or loss reported by petitioners on their returns, the approximate increases or decreases in their net worth and resulting net income or loss which they now maintain was sustained, and the increases in their net worth and the amounts of net income disclosed by the net worth statement prepared by respondent's agents for each of the years in issue.

| Year | Net income reported | Petitioners | | Respondent | |
|---|---|---|---|---|---|
| | | Increase or decrease in net worth | Net income received | Increase in net worth | Net income received |
| 1945 | | ($19,344.44) | ($4,768.22) | ($8,391.16) | $7,913.84 |
| 1946 | | 11,171.83 | 12,226.83 | 14,434.70 | 16,989.70 |
| 1947 | ($2,925.59) | (1,453.52) | (73.52) | 6,668.55 | 9,548.55 |
| 1948 | (3,922.37) | 7,609.48 | 5,989.48 | 10,847.29 | 13,727.29 |
| 1949 | (1,710.33) | (523.56) | 1,843.11 | 5,658.73 | 9,025.40 |
| 1950 | 284.65 | (1,838.94) | 41.06 | 3,452.15 | 6,332.15 |
| 1951 | 740.65 | (245.90) | 1,634.10 | 6,013.68 | 8,893.78 |

A search of the files of the office of the district director of internal revenue at Nashville, Tennessee, revealed no record of income tax returns having been filed by either petitioner for the years 1930 through 1945. A similar search revealed no record of the filing by petitioners of declarations of estimated tax for the years 1943 through 1951.

The notice of deficiency covering all of the years in issue was mailed to petitioners on July 20, 1955. The petitioners have extended by timely execution of Forms 872 the periods of limitation for the assessment and collection of income tax for the calendar years 1947, 1949, 1950, and 1951, to dates subsequent to the date of issuance of that notice.

Petitioner understated his income in the separate returns which he filed for the taxable years 1946 through 1948, and in the returns which he filed jointly with his wife for the years 1949 through 1951. A part of the deficiencies determined for each of the years 1945 through 1951 was due to fraud with intent to evade tax.

### OPINION.

Respondent determined deficiencies in petitioners' income tax for the years in issue on the basis of increases in their net worth plus nondeductible expenditures. While no direct issue with respect to

the use of that method has been raised, petitioners seem to indicate that a reconstruction on the basis of specific items of income would produce a more logical and less distorted result. There is no merit in their position. It is well settled that in circumstances such as are here present respondent may resort to the net worth method of reconstructing petitioners' net income. *Holland* v. *United States*, 348 U. S. 121 (1954); *Morris Lipsitz*, 21 T. C. 917 (1954), affd. 220 F. 2d 871 (C. A. 4, 1955), certiorari denied 350 U. S. 845 (1955).

Other than the question of fraud the issues herein are confined solely to the items appearing on the net worth statement. Many of those items have been stipulated to be correct. There remain in issue only those which are discussed below.

Among the assets included in the net worth statement as of December 31, 1944, were 6 bales of cotton valued at $540. It is now contended that as of that date petitioner owned 34 bales of cotton worth $3,060, of which 22 were sold during 1945 for $1,850.72, and 12 during 1946 for $972.50. Assuming, but not deciding, that petitioners satisfactorily have established ownership of the additional bales of cotton as of December 31, 1944, they have not proven their basis therefor. The amount for which the additional bales were sold in a subsequent year may establish their value at such later date, but it is the taxpayer's basis for gain or loss in the asset which appears on the net worth statement. In the absence of such proof we sustain respondent's determination with respect to this item.

At the close of 1944, petitioner held in his safe-deposit box certain State and county bonds which had a cost to him of $16,000. During the fall of 1944, interest coupons in the amount of $398.50 matured on those bonds, but petitioner was unable to present them for payment because of an attachment of his assets by his former wife. On November 15, 1945, petitioner sold those bonds realizing $3,716.13 in excess of the amount which he paid for them. Of that excess amount, $398.50 represented interest coupons which had matured as of the close of 1944, $867.63 represented interest coupons which had matured during 1945, and $2,450 represented the increment in value attributable to the bonds themselves. Petitioners' present position is that the entire $3,716.13 should have been included in net worth as of the close of 1944.

Clearly, neither the increase in value of the bonds which was realized upon their sale in 1945, nor the amount represented by interest coupons maturing during 1945 is includible in net worth as of the close of 1944, since to do so would give petitioners the benefit in 1944 of the ultimate gain realized in 1945 without the accompanying tax liability in that later year. Neither are the coupons which matured during the fall of 1944, and which were uncashed as of the close of that year, properly assets of the petitioner to be included in his net

worth as of December 31, 1944. They had never been included in taxable income so far as this record shows and had no basis at which they could be treated as an asset in determining opening net worth. What we are here seeking to establish is petitioners' opening net worth for income tax purposes. For that purpose the matured coupons, which had never been reported as income, had no basis in 1944 and they were not properly includible for net worth purposes.

Because of our disposition thereof, petitioners' next six assignments of error will be considered together. They maintain that the statement of net worth as of the close of 1944, fails to take into account savings bonds coowned by petitioner and his mother. They claim that a liability for store accounts payable as of the close of that year should be reduced from $3,500 to $1,459.42. They contend that adjustments must be made for gifts received by petitioner from his parents during 1945 and 1948, and further claim that their living expenses have been overestimated for each of the years in issue, and their household furniture overvalued for the years 1947 through 1951. Finally they maintain that liabilities should be increased in each of the years to account for checks outstanding at the close thereof which were issued in payment for merchandise then in stock in the Decaturville store.

With respect to each of these items the record is patently incomplete. In some instances, petitioners have introduced no evidence to support their position; in others, we have only their self-serving declarations as to the existence of the fact sought to be proven. Groups of canceled checks have been exhibited, which, lacking further explanation, we find meaningless. Petitioners' brief is hardly more than a catalog of the original assignments of error appearing in their petition, and sheds little, if any, light on their present position. In short, after a careful consideration of the entire record we have concluded, and now hold, that petitioners have failed to carry their burden of demonstrating error in respondent's determination with respect to each of the six items set forth immediately above, and respondent is therefore sustained.

Petitioners next maintain that net worth as of the close of 1944 and 1945, should be increased to take into account certain matured bond coupons which were then on hand but which were not cashed until 1946. For the reasons enumerated above we find no merit in their position.

Finally, petitioners contend that as of December 31, 1933, they had on hand $28,800 in cash in addition to the amount allowed them by the respondent. They maintain that as of that date, petitioner had in his safe-deposit box $10,000 more cash than that with which respondent has credited him, and an additional $18,800 secreted in a

battery hull which was buried in a ditch, some 4½ feet deep and 18 inches wide, located at the north end of the basement which underlay petitioner's general store in Decaturville. Moreover, we have before us a schedule, prepared by petitioners, which purports to account for the expenditure of every dollar of that cash hoard over the period from 1946 through 1951. From that schedule it would appear that some $22,000 of the unaccounted for funds ultimately found its way into petitioner's mortagage note investments.

The short answer is that the record does not support petitioners' contentions. It seems somewhat odd that petitioner, a man who kept no formal records of his mercantile business, and who offered none for his mortgage note transactions, is now able to present such a meticulous account of the expenditure of $28,800 during a 6-year period. Nor are we able to reconcile the present position with the plea of petitioner, entered in the divorce proceeding against him, that as of October 3, 1944, he possessed only $8,000 in cash in a safe-deposit box in Nashville. Moreover, our refusal to accept petitioners' present contention stems in great part from the fact that we have only their unsupported word for it. A witness did appear who testified that it was only after unexplained trips to Decaturville that petitioner would close large cash purchases of mortgage notes from him. However that witness admitted he was unaware of the source of that cash. We are not disposed, as petitioners would have us believe, that those moneys had their origin in the north end of the basement which underlay the general store in Decaturville. We are unable to give credence to petitioner's story and therefore conclude, and so hold, that petitioner did not have cash on hand during any of the years in issue in any amount in excess of that appearing on respondent's net worth computation.

With respect to the issue of fraud the burden is upon respondent. After a careful review of the present record we are of the opinion that he has met that burden.

Other than canceled checks and bank deposit acknowledgments, petitioner maintained no records of his mercantile business in Decaturville. Though it is contended that he kept complete records of his mortgage note transactions, a contention definitely not supported by this record, the facts established by respondent at trial clearly indicated petitioner's unwillingness to cooperate with the investigating agents by making those records available. Cooperation of a sort was obtained only after investigation had uncovered some 75 specific note transactions with which petitioner had been connected. Conduct of this nature is indication of an effort to conceal the true facts concerning income. *Bryan* v. *Commissioner*, 209 F. 2d 822 (C. A. 5, 1954), certiorari denied 348 U. S. 912 (1954), affirming a Memorandum Opinion of this Court dated October 10, 1951.

Further, we note that petitioners, by virtue of their present position, in effect concede understatements of net income in the approximate amounts of $12,226.83 for 1946, $5,989.48 for 1948, $1,843.11 for 1949, and $893.45 for 1951. Circumstances such as this are strong evidence of fraud. *Abraham Galant*, 26 T. C. 354 (1956). In addition, petitioner realized a gain of $1,991.25 upon the sale of certain bonds during 1945, no part of which was reported. We are therefore confronted with understatements in each of the years 1945, 1946, 1948, 1949, and 1950 which are conceded or clearly proven but totally unexplained.

Discrepancies such as this, between actual net income and reported net income over a number of years, are further evidence of fraud, *Holland* v. *United States, supra; Rogers* v. *Commissioner*, 111 F. 2d 987 (C. A. 6, 1940), affirming 38 B. T. A. 16 (1938) ; *Louis Halle*, 7 T. C. 245 (1946), affd. 175 F. 2d 500 (C. A. 2, 1949), certiorari denied 338 U. S. 949 (1950).

Further, we note we are not dealing with an individual entirely unfamiliar with the law and its requirements. Rather, petitioner is a man possessed of an above average education who has served in positions of public trust, and who presumably knew what was expected of him by his Government.

In the light of petitioner's background, and in the light of the record as a whole, including but not limited to his failure to keep business records, his failure to cooperate with respondent's agents, the understatements of income in each of the years 1945, 1946, 1948, 1949, and 1950, we are convinced, and have found as a fact, that a part of the deficiencies for each of the years 1945 through 1951 was due to fraud with intent to evade tax.

No issue has been raised with respect to the additions to tax under section 291 (a), section 294 (d) (1) (A), and section 294 (d) (2), and they therefore are sustained with adjustments to take into account our disposition of the above issues.

*Decision will be entered under Rule 50.*