RUSSELL ABERNATHY AND BETTY ABERNATHY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Abernathy v. Commissioner
Docket No. 6398-75.
United States Tax Court
T.C. Memo 1978-370; 1978 Tax Ct. Memo LEXIS 142; 37 T.C.M. (CCH) 1529; T.C.M. (RIA) 78370; September 18, 1978, Filed John B. Owens, Jr. & H. Stennis Little, for the petitioners. Richard J. Neubauer, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a deficiency in petitioners' income tax for 1971 of $ 52,259.44, plus an addition to tax for fraud under section 6653(b) [1] of $ 26,129.72. Due to concessions by both parties, [2] the issues for decision are: 1. Whether any part of petitioners' underpayment of tax was due to fraud; and 2. Whether petitioners are entitled to employ the income averaging provisions of sections 1301 through 1305; specifically, whether petitioners have established their correct taxable *143 income for 1967 and 1968. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. At the time they filed their petition, Russell and Betty Abernathy were residents of Union City, Tennessee. Betty is a party only by virtue of having filed a joint return with her husband. When we hereafter refer to petitioner, we will be referring to Russell. Petitioner is a motorcycle dealer in Union City, Tennessee. He began this business on a part-time basis in 1958, and has worked on a full-time basis since 1961. In 1958 he acquired a franchise to sell Harley-Davidson motorcycles; he retained that franchise through 1971. Prior to 1969 petitioner also sold Suzuki motorcycles. In December 1969 petitioner acquired a franchise to sell Honda motorcycles. This was very important to his business since Honda had *144 approximately 50 percent of the total motorcycle market. Petitioner received and began selling his first Hondas in 1970. Hondas soon represented 80 percent of petitioner's business. During 1971 petitioner worked long hours, often from six or seven in the morning until ten or later at night. Customarily on Sunday he drove 500 miles from Union City to Baton Rouge, Louisiana, picked up a load of motorcycles (usually 60 to 80 motorcycles) on Monday morning, and returned to Union City that day. He unloaded the motorcycles on Tuesday and, with help from employees, set up the bikes. Each motorcycle took approximately one hour and forty-five minutes to set up. He kept his business open Tuesday through Saturday. He sold from 20 to 40 motorcycles on Saturdays. We do not know the exact number of motorcycles petitioner sold in 1971, but it was more than the 900 he sold in 1970 and less than 3,000. In 1970 petitioner had taxable income of $ 58,587.79 from the sale of approximately 900 bikes. Petitioner also repaired motorcycles for a fee. Petitioner's bookkeeping was done by Mrs. Taylor. She started doing his tax returns in 1964 and began doing his bookkeeping in April 1971. *145 Prior to 1971, petitioner brought Mrs. Taylor a schedule containing the totals of his income and expenditures from which she prepared his tax returns. Petitioner also furnished Mrs. Taylor with the information needed to compute depreciation on the return. Mrs. Taylor filled out the returns based on the information petitioner gave her and, with his check if any tax was due, mailed the returns. In 1971 petitioner began using so-called WHIZ tickets for recording income and expenditures at his motorcycle shop. Each WHIZ ticket produced three copies--one stayed locked inside the WHIZ ticket machine, one was placed on a spindle in petitioner's office and one was given to the customer as his receipt. Petitioner agreed to furnish Mrs. Taylor all the WHIZ tickets (which showed all sales and expenditures) and from these tickets she was to post his income and expenses in the books. Each month Mrs. Taylor went to petitioner's place of business, and either petitioner or his wife gave Mrs. Taylor the WHIZ tickets. Because the WHIZ ticket machine was locked, none of the WHIZ tickets which were written could be lost. If Mrs. Taylor was not given a WHIZ ticket for a particular transaction, *146 that transaction was never entered into petitioner's books. Mrs. Taylor made one major error in posting WHIZ tickets in 1971. Mrs. Taylor posted purchases of Harley-Davidson motorcycles paid directly to Harley-Davidson and other purchases paid through the Old and Third National Bank. She noticed that amounts charged to purchases were very large while sales were not. She concluded that she was duplicating posting of purchases, and she notified petitioner of her belief. He did not agree or disagree. After she informed petitioner of her belief, Mrs. Taylor struck the purchases paid through the bank from the books. In fact there was no duplication. Petitioner was not familiar with bookkeeping practices. He was able, however, to produce an opening inventory figure for 1971 when Mrs. Taylor requested it. Also, in years prior to 1971, he produced the figures needed to prepare his returns. He never suggested to Mrs. Taylor that she keep his books in any manner that did not clearly reflect his income. Nevertheless, the books kept by Mrs. Taylor showed adjusted gross income in 1971 (as reported on petitioner's return) of $ 6,679.71. In fact, petitioner's correct adjusted gross *147 income for that year (conceded in this case) was $ 115,362.94. During 1971 petitioner deposited $ 844,938.94 in his business bank account, but the amount of sales reported on his 1971 tax return was only $ 590,499.57. [3]
When respondent's agents audited petitioner, they chose June 1971 as a test month. A comparison was made between petitioner's banking records, particularly checks deposited into his business account, and transactions recorded in his books as kept by Mrs. Taylor. This comparison showed that 15 checks totalling $ 7,252.59 were deposited in petitioner's business *148 bank account for which there were no WHIZ tickets. All these checks represented payments for motorcycles and in each instance the payor dealt with petitioner personally. Each was given a bill of sale and title documents, but no WHIZ ticket was made. In addition, on June 9, 1971, petitioner sold a motorcycle for $ 825 to a Mr. Joe Wallace. A receipt was executed on the type of form which petitioner used in his business before he began using the WHIZ ticket machine. Petitioner did not give this old style receipt to Mrs. Taylor for posting in his books. Moreover, on June 5, 1971, a Mr. Eddie Fuqua had repairs made on his motorcycle at Abernathy's motorcycle shop. Mr. Fuqua received an invoice and paid by check; he also did not receive a WHIZ ticket. Petitioner incurred various expenses in 1971. He purchased a Winnebago camper for $ 12,500, paying $ 10,000 cash and trading-in a camper which he owned. He purchased a Buick for his eldest son for $ 3,800; he paid for this purchase with a check. He traded in his Cadillac for a new one, and he paid $ 1,474.05 in addition to the trade. He also paid $ 1,926.08 for food, $ 1,825.68 for mortgage payments, $ 1,636.02 for insurance premiums, *149 $ 2,000 to a Christmas Club Fund, and $ 737.49 for income taxes. In addition, he also paid off loans in the amount of $ 30,000 and paid for an addition to his building costing $ 14,000. The total of the above known expenditures in 1971 is $ 65,573.64. Petitioner concedes not only that he underreported his 1971 income but also that he underreported his income in 1969 and 1970. Petitioner reported income of $ 469.18 and $ 6,557.68 in 1969 and 1970, respectively; in fact his taxable income in those years was $ 21,980.95 in 1969 and $ 58,587.79 in 1970. Petitioner reported income of $ 3,305.77 in 1967 and $ 1,835.50 in 1968. He has no records for his income and expenses in 1967 and 1968. He spent $ 4,750.66 in 1967 and $ 6,767.10 in 1968 for known expenditures, including insurance premiums, electricity and property taxes, loan repayments, automobile purchases, and income taxes. In addition, other estimated personal living expenses incurred by petitioner in 1967 and 1968 for items such as food, clothing, automobile expense and haircuts totaled $ 2,664 each year. (During 1967 through 1971 petitioner's family consisted of himself, his wife and four children.) In 1969, in connection *150 with obtaining the Honda franchise, petitioner submitted a net worth statement to American Honda Motor Company, Inc. This statement showed a net worth of $ 181,611.82. [4] He filed a supplemental net worth statement with American Honda in 1971 in which he showed a net worth of $ 378,840. [5]
*151 During a criminal investigation of petitioner's tax liability, petitioner was asked if he kept any safety deposit boxes. He replied that he had one in which he kept insurance papers. In fact he had another box in the name of R. C. Cantrell which contained cash. Petitioner denied he knew the name R. C. Cantrell when asked by the investigating agent. At trial he claimed to have forgotten about the box. In the statutory notice, respondent determined that petitioner underreported his income by $ 111,124.98; petitioner has conceded that he understated his income by $ 108,683.93. Respondent further determined that part of petitioner's underpayment of tax was due to fraud, and an addition to tax under section 6653(b) was determined. In his petition, petitioner claimed that he was entitled to employ income averaging if respondent's determinations were upheld; respondent denied this claim in his answer. OPINION The first issue is whether any part of petitioner's $ 108,683.93 underpayment of tax in 1971 was due to fraud. Section 6653(b) provides that if any part of an underpayment of tax is due to fraud, an addition to the tax equal to 50 percent of the total underpayment shall *152 be imposed. Respondent has the burden of proving fraud (section 7454(a)) and clear and convincing evidence is required to carry this burden. Rule 142(b), Tax Court Rules of Practice and Procedure; Kashat v. Commissioner,229 F. 2d 282, 285 (6th Cir. 1956); Otsuki v. Commissioner,53 T.C. 96, 106 (1969). The existence of fraud is a question of fact to be determined upon consideration of the entire record. Stratton v. Commissioner,54 T.C. 255, 284 (1970). To prove fraud, respondent must show that the taxpayer acted with the specific intent to evade a tax believed to be owing. Cefalu v. Commissioner,276 F. 2d 122, 128-129 (5th Cir. 1960); Estate of Temple v. Commissioner,67 T.C. 143, 159 (1976). Fraud is never presumed or imputed; mere suspicion of fraud is not sufficient. Switzer v. Commissioner,20 T.C. 759, 765 (1953). Respondent, however, may meet his burden of proof through circumstantial evidence. Powell v. Granquist,252 F. 2d 56, 61 (9th Cir. 1958). On the basis of all the evidence, we conclude that respondent has carried his burden here. Petitioner *153 sold motorcycles. His business was sizable, as demonstrated by the fact that almost every Sunday he drove 500 miles to pick up 60 to 80 motorcycles, which apparently were sold during the following week. Nvertheless, petitioner reported income of only $ 6,679.91 in 1971. In fact--and petitioner concedes--his actual income in that year was $ 115,362.94. Petitioner's accounting was based on so-called WHIZ tickets. The WHIZ tickets produced sales receipts in triplicate--one copy went to the customer, one was placed on a spindle, and the third remained inside the machine. For every transaction--all sales and purchases--petitioner and his employees were supposed to write up a WHIZ ticket. Petitioner's bookkeeper then posted these transactions monthly. His income tax return for 1971 was based on these posted transactions. Petitioner's gross understatement of income for 1971 was apparently due to the fact that no WHIZ tickets were prepared for many motorcycles he sold. For example, in June 1971 petitioner personally sold motorcycles to at least 15 individuals who paid by check. He deposited these checks in his business bank account. Each purchaser was given a bill of sale and title *154 documents, but not a WHIZ ticket. One purchaser was given a receipt of the type petitioner used before he converted to using WHIZ tickets. Without a WHIZ ticket for each sale, there was no way that these sales would be recorded in petitioner's books. Furthermore, 1971 was not the only year in which petitioner concededly underreported his income. He reported income of $ 469.18 and $ 6,557.68 in 1969 and 1970, respectively; in fact his taxable income in those years was $ 21,980.95 in 1969 and $ 58,587.79 in 1970. This last fact, that petitioner consistently and substantially underreported income, is, by itself, strong evidence of fraud. Cefalu v. Commissioner,276 F. 2d 122, 129 (5th Cir. 1960). In Rogers v. Commissioner,111 F. 2d 987, 989 (1940), the Court of Appeals for the Sixth Circuit (to which appeal of this decision would lie) noted that "[discrepancies] of 100% and more between real net income and the reported income for three successive years strongly evidence an intent to defraud the Government." See also Vise v. Commissioner,31 T.C. 220, 227 (1958), affd. 278 F. 2d 642 (6th Cir. 1960). In this case, *155 the discrepancies were about 4,500% in 1969, 900% in 1970, and 1,700% in the year at issue. In addition, petitioner's failure to maintain adequate records during 1971 is evidence of fraud. See Cefalu v. Commissioner,supra at 129. He failed to record many of his sales, although he did record purchases. In fact, recorded purchases were so great in comparison to recorded sales that petitioner's bookkeeper erroneously assumed she was duplicating purchases on the books. After talking with petitioner, she struck some purchases from the books. Had she not made this error, petitioner's books would have showed that his business operated at a net loss in 1971. Furthermore, petitioner knew that his income was considerable, as evidenced by his expenditures during 1971. He purchased a Buick for his son for $ 3,800 and traded in his 1970 Cadillac on a 1971 Cadillac at the cost of $ 1,474.05. He purchased a Winnebago camper for $ 10,000 plus a trade-in. He repaid outstanding loans totaling $ 30,000. The total of his known expenditures in 1971 was $ 65,573.64, in comparison to reported income of only $ 6,679.71. This discrepancy is further proof of petitioner's *156 fraudulent intent. Nuckols v. Commissioner,31 T.C.M. 761, 41 P-H Memo. T.C. par. 72,153 (1972). At trial petitioner implied that the discrepancy between his true and reported income was due to the fact that some of the WHIZ tickets had been lost; on brief he contends that the discrepancy was due to errors by his bookkeeper. We find both explanations totally implausible. In the first place, petitioner conceded at trial that WHIZ tickets could not be lost since the copies given to the bookkeeper were locked in the WHIZ ticket machine.Second, the evidence shows that WHIZ tickets were not written up for many sales. [4] Finally, we found petitioner to be almost completely lacking in credibility. His testimony was vague, contradictory and incredible. For example, he first asserted that some WHIZ tickets had been lost but then conceded that this was impossible. He also denied at trial that he had ever sold a motorcycle to a customer without writing up a WHIZ ticket, but he had previously stipulated to that very fact. This lack of credibility does not establish petitioner's fraud, but leads us to discount his explanation of his business affairs. *157 In light of the foregoing, we conclude that respondent has shown by clear and convincing evidence that all or part of petitioner's underpayment of tax in 1971 was due to fraud. The next issue is whether petitioner is entitled to employ income averaging in 1971. Sections 1301 through 1305. Specifically, the issue here is whether petitioner has established his correct taxable income for 1967 and 1968. Respondent contends that petitioner has not met his burden of doing so. In his petition, petitioner claimed that he is entitled to employ income averaging. Under section 1301, the "average base period income" must be established before the 1971 tax liability under the income averaging provisions can be determined. In this case, the base period years for 1971 are 1967 through 1970, and the "average base period income" is one-fourth of the combined taxable income for those four base period years. The taxable income to be used for each base period year is the correct taxable income for such year, not the taxable income as reported. Unser v. Commissioner,59 T.C. 528, 530 (1973). The burden of proving petitioner's correct taxable income is on petitioner. Welch v. Helvering,290 U.S. 111 (1933); *158 Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioner concedes that he underreported his income for 1969 and 1970, and the correct amount of his taxable income for those years has been stipulated by the parties. As to 1967 and 1968, however, petitioner contends that the amounts he reported on his returns were correct. We conclude that petitioner has failed to carry his burden of proof. Petitioner presented no documentation to support his claim that his income was $ 3,305.77 in 1967 and $ 1,835.50 in 1968. He conceded at trial, however, that he spent $ 4,750.66 for known expenditures in 1967, and $ 6,767.10 for such expenditures in 1968. In addition, his other estimated living expenses for those years totaled $ 2,664 each year. Furthermore, in 1969 he signed a net worth statement ie which he asserted to American Honda Motor Company, Inc. that his net worth was $ 181,611.82. Petitioner presented no credible explanation of the source of the funds for the expenditures. He also presented no explanation for his accumulation of wealth on such a low income. His only evidence was his own testimony which we found not credible. We are not bound to accept petitioner's *159 testimony at face value, even if uncontradicted, where it is "improbable, unreasonable or questionable." Banks v. Commissioner,322 F. 2d 530, 537 (8th Cir. 1963). [5]
Petitioner's testimony is full of inconsistencies. For example, in 1969 (before he acquired the Honda franchise) he had income of $ 21,980.95; his business was essentially the same then as in 1967 and 1968. In all three years he sold Harley-Davidson and Suzuki motorcycles. Petitioner, however, presented no evidence as to why his reported income for 1967 and 1968 was so much smaller than his 1969 income. Furthermore, he presented no explanation for the source of funds for his many expenditures in 1967 and 1968 except that he had borrowed money. The facts indicate, however, that petitioner's only indebtedness at the end of 1968 was his mortgage of approximately $ 15,000, loans secured by his inventory of motorcycles and parts totaling $ 13,361.50, and other liabilities of approximately $ 2,500. Such small liabilities do not explain how his expenditures could so greatly exceed his income. *160 Petitioner's reliance on the fact that respondent does not have a "starting point" for a net worth calculation with respect to 1967 and 1968 is misplaced. Respondent is not establishing petitioner's income for those years; rather, respondent's evidence of petitioner's expenditures is meant to cast doubt on petitioner's testimony that his income was as reported. In order to employ income averaging, petitioner must establish his correct income for these years. We are convinced that the income reported on petitioner's returns for 1967 and 1968 was too small. However, we do not believe his income for those years exceeded his income of approximately $ 22,000 in 1969. Therefore we hold that his income for 1967 and 1968 was $ 22,000 each year for income averaging purposes. Due to concessions, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue. The fraud penalty applies only to Russell Abernathy. ↩
2. The parties have stipulated that petitioners understated their 1971 income by $ 108,683.93, rather than by $ 111,124.98, as determined in the notice of deficiency.↩
3. Deposits in petitioner's bank account compared with sales reported on his return on a monthly basis in 1971 are as follows: ↩
Sales per Books
Deposits
and per Return
January
$ 13,848.45
$ 14,100.97
February
33,855.07
33,682.30
March
71,362.55
35,788.18
April
105,686.16
62,207.80
May
107,870.39
79,092.85
June
117,185.97
71,716.85
July
89,160.49
67,249.89
August
68,538.47
51,119.47
September
$ 71,357.12
$ 44,203.20
October
74,076.17
56,374.33
November
29,960.95
24,583.14
December
62,037.06
50,380.59
Totals
$ 844,938.85
$ 590,499.57
4. Petitioner's 1969 net worth statement was as follows: ASSETS: Cash in bank
$ 38,050.70
Accounts Receivable
2,050.00
Inventory at Wholesale
25,500.00
Investments - Stocks, Bds.
14,000.00
Real Estate
35,000.00
House (Real Estate)
45,000.00
Fixtures in Business (tools
and equip.)
20,000.00
G.M.C. 1969 - two trailers
2,500.00
1970 Cadillac
6,900.00
1962 Cadillac
870.00
1965 Buick
1,495.00
Mobile Home
3,680.00
House Boat
4,000.00
TOTAL ASSETS
$ 199,045.70
LIABILITIES: Notes payable to banks
2,433.88
Mortgage on business real est.
3,000.00
Mortgage on house
12,000.00
TOTAL LIABILITIES
17,433.88
NET WORTH
181,611.82
TOTAL LIABILITIES & NET WORTH
$ 199,045.70
See Todd v. Commissioner,     T.C.M.    , 47 P-H Memo. T.C. par. 78,214 (1978).
[5] Petitioner's 1971 net worth statement was as follows: ↩
ASSETS: Current assets: cash in bank
$ 20,270.00
accounts receivable
2,000.00
inventory (cost)
222,500.00
$ 244,770.00
Investments: mutual fund
5,040.00
church bond
18,000.00
23,040.00
Fixed assets: real estate
building
9,000.00
improvements
8,000.00
new building (projected value
$ 16,000.00)
2,600.00
lot (market value $ 10,000.00)
4,000.00
23,600.00
Fixtures in business:
20,000.00
20,000.00
Other assets: house (market value $ 45,000.00)
36,800.00
cars
Cadillac '71
6,700.00
GMC pickup '69
2,500.00
GS Buick '71
4,500.00
GMC 2 Ton truck
10,000.00
Trailer
380.00
Fork lift
1,500.00
Travel trailer
15,800.00
House boat
3,000.00
31,180.00
TOTAL ASSETS:
$ 392,590.00
LIABILITIES: Current liabilities: notes payable
mortgage
$ 1,000.00
tax liabilities
1,750.00
$ 2,750.00
Long term liabilities
bank loan
11,000.00
11,000.00
TOTAL LIABILITIES
13,750.00
NET WORTH
$ 378,840.00
TOTAL LIABILITIES & NET WORTH
$ 392,590.00
4. The only known accounting error committed by petitioner's bookkeeper was the deletion of some purchases.↩