JESSE W. AND MARGIE E. STONECIPHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, RespondentStonecipher v. CommissionerDocket No. 14362-84.United States Tax CourtT.C. Memo 1988-41; 1988 Tax Ct. Memo LEXIS 44; 55 T.C.M. (CCH) 56; T.C.M. (RIA) 88041; February 9, 1988. Richard L. Meives, for the petitioners. Michael W. Bitner, for the respondent. HAMBLENMEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: For petitioners' taxable year ended December 31, 1980, respondent determined a deficiency in petitioners' Federal income taxes of $ 15,279 and an addition to tax under section 6653(b) 1 of $ 7,640. After concessions, 2 the sole issue for determination is whether respondent has failed to carry his burden of proof by clear and convincing evidence that petitioners fraudulently failed to report taxable gains realized from their 1980 sales of silver and gold coins. 3*45 FINDINGS OF FACT Some of the facts of this case have been stipulated and are found accordingly. The stipulation of facts and exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Pass Christian, Mississippi, at the time they filed their petition. During the tax year in issue, they resided in Mahomet, Illinois. They timely filed their 1980 joint Federal income tax return with the Kansas City Service Center. During the taxable year 1980, petitioner Jesse W. Stonecipher worked as both a Professor and the Assistant Administrator of the Department of Aviation of the University of Illinois, Urbana, Illinois. During this same year, Mr. Stonecipher also owned rental property and operated a sole proprietorship known as Jesse W. Stonecipher & Associates. This latter enterprise was in the business of aviation accident reconstruction. 4 As for petitioner Margie E. Stonecipher, while she was not gainfully employed outside of the petitioners' home during the taxable year 1980, she did have full knowledge and enjoyed the use and benefit of all income received by petitioners during the taxable year 1980. *46 In May 1974, Mr. Stonecipher began to buy gold and silver coins and made the following purchases prior to January 18, 1980: DateItemsCost5-23-7430 Gold Coins$ 5,670.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 Gold Coins5,304.006-21-742000 Silver Coins3,460.007-11-742000 Silver Coins3,050.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 Gold Coins2,460.0011-13-7422 Gold Coins4,319.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 Gold Coins3,345.857-2-7515 Gold Coins2,678.999-27-752000 Silver Coins3,300.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 Gold Coins1,100.0012-20-752000 Silver Coins3,125.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 Gold Coins2,405.003-13-762000 Silver Coins3,070.209-21-762000 Silver Coins3,228.303-1-7715 Gold Coins3,633.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 Gold Coins4,671.5011-30-7820 Gold Coins4,138.50He purchased these coins both as "hedges against inflation" and as assets on which he and his wife could rely for money in the future. When he made a purchase of coins, Mr. Stonecipher recorded the transaction in one of two ways. If he received a receipt from the seller, he placed this receipt in a manila folder he had labelled "Coins." If he did not receive a seller's*47 receipt, as happened on two or three occasions, he recorded the date of the purchase, the items purchased, and the amount paid on a sheet of paper and placed this sheet in the same manila folder. Mr. Stonecipher retired from the University of Illinois in 1982 at the age of 65. 5 In anticipation of his retirement, he and his wife decided in 1980 to purchase a second residence in Mississippi. They originally intended to spend no more than $ 50,000 on this second residence and to live in it only during the fall and winter months. Wanting to raise enough cash to buy their Mississippi home outright, 6 petitioners sold on January 18, 1980, $ 59,250 silver coins to F. J. Vollmer & Company, Inc. ("F. J. Vollmer"), a Bloomington, Illinois, dealer in precious metals. The total sales price was divided among*48 ten checks from F. J. Vollmer and made payable to J. W. Stonecipher. Nine checks were each in the amount of $ 6,000; one was in the amount of $ 5,250. Accepting these checks, petitioners carried them across the street from F. J. Vollmer's shop to the McLean County Bank, the bank upon which the checks of F. J. Vollmer were drawn. At the bank, Mr. Stonecipher had the checks converted into nine cashier's checks of $ 6,000 each, one cashier's check of $ 4,000, and cash equal to $ 1,250. 7 Mr. Stonecipher decided to go to the McLean County Bank because he wanted to be sure that the checks he received from F. J. Vollmer would be honored. He decided to get cashier's checks because he thought that no one in Mississippi would willingly accept his personal check for the amount of the house he and his wife eventually decided to buy. Mr. Stonecipher had no particular reason for choosing the denomination of the cashier's checks he received. He did not, however, want to have a single check because he was unsure of the final*49 price of the house that he and his wife were going to buy. He wanted to be in a position to negotiate the house's price and to have the funds at his disposal approximate this negotiated price. Finally, Mr. Stonecipher wanted $ 1,250 in cash to pay for his and his wife's expenses in travelling to Mississippi to locate a home. After the sale of silver coins, petitioners travelled to Mississippi. On arriving in Mississippi, they were unable to find a suitable house for $ 50,000. They did, however, locate a house in Pass Christian, Mississippi, for $ 79,000 and executed an agreement to purchase this house on January 31, 1980. At the time of the agreement's execution, petitioners deposited $ 10,000 in earnest money with Dantagnan Realty, Inc., Bay St. Louis, Mississippi. Petitioners paid this $ 10,000 with the $ 4,000 cashier's check and one of the $ 6,000 cashier's checks which they received from the McLean County Bank. Because the purchase price of the Pass Christian*50 residence exceeded the remaining amount of the cashier's checks which petitioners had received on January 18, 1980, petitioners decided to make a second coin sale. On February 18, 1980, Mrs. Stonecipher, unaccompanied by her husband, 8 sold $ 29,610 in gold coins to F. J. Vollmer. Mr. Stonecipher gave Mrs. Stonecipher no specific instructions as to how she was to conduct this second sale. The $ 29,610 sales price was divided among five checks from F. J. Vollmer and made payable to M. E. Stonecipher. Four checks were each in the amount of $ 6,000; one check was in the amount of $ 5,610. On February 20, 1980, Mrs. Stonecipher went to the McLean County Bank and had the five checks from the second sale converted into four cashier's checks of $ 6,000 and cash equal to $ 5,610. 9 Mrs. Stonecipher was unaccompanied on her trip to the bank, and her husband gave her no specific instructions as to the amount of cash she was to get. She wanted cashier's checks because her husband had gotten them on the first sale and because these checks offer a safe*51 way to carry large amounts of money. She had no particular reason for choosing the denomination of the cashier's checks she received and decided on splitting up the sum among several cashier's checks because she did not want one check. Finally, Mrs. Stonecipher wanted $ 5,610 in cash to pay for furniture for the Mississippi home. After the second coin sale, petitioners returned to Mississippi. They closed on their Pass Christian home on March 7, 1980. The closing was handled by the law firm of Favre, Genin & Scafide of Bay St. Louis, Mississippi, a firm that represented only the seller. 10 At that time, petitioners remitted the 12 remaining $ 6,000 cashier's checks which they received from the McLean County Bank on January 18, 1980, and on February 20, 1980, to the law firm of Favre, Genin & Scafide in full payment for the Pass Christian home. These cashier's checks were deposited in the escrow account of Favre, Genin & Scafide. Because petitioners*52 had tendered $ 82,000 (the $ 10,000 paid to the real estate firm as an earnest money deposit plus the $ 72,000 paid to the law firm), an amount greater than the final purchase price of $ 79,319.02, the law firm of Favre, Genin & Scafide issued petitioners a check in the amount of $ 2,680.98. On March 10, 1980, petitioners opened a checking account by depositing the check which they received from the law firm of Favre, Genin & Scafide at the Hancock Bank, Bay St. Louis, Mississippi. Petitioners took this action because they wanted to establish a bank account in Mississippi from which they could write checks for the payment of expenses tied to their Pass Christian home. Using the cash they had on hand and writing checks on their newly established Mississippi bank account, petitioners paid for a number of items to furnish their new home. Mr. Stonecipher*53 kept the receipts from these many purchases in a manila folder he labelled "Pass Christian." After making these purchases, petitioners deposited $ 4,000, the remainder of the on-hand cash that they had not spent on furniture, into their Mississippi bank account. Petitioners then returned to their home in Illinois. On November 1, 1980, Mr. Stonecipher took a sabbatical leave from the University of Illinois. During the middle of this month, he and his wife loaded two cars and a trailer with bedding, televisions and other household items and travelled to their Mississippi residence to spend the winter. On April 1, 1981, petitioners began their return trip to Illinois. They drove separate cars and returned with most of the items they had initially taken to Pass Christian. Mrs. Stonecipher got lost on the return trip, and petitioners did not reach their Illinois home until April 3, 1981. 11Petitioners' 1980 joint Federal income*54 tax return was signed by Earl R. Payne, a paid preparer and tax adviser in Urbana, Illinois. However, this return was prepared in the following manner. Mr. Stonecipher began its preparation while still in Mississippi and completed it in Illinois. In preparing the rough draft of this return, Mr. Stonecipher relied on the tax return he had filed for the previous year. Based primarily on this previous year's return, he collected the information, books, and manila folders he needed to complete his return for the taxable year ended 1980. 12 He then had this rough draft reviewed by Mr. Payne, who suggested changes that were necessary. Mr. Stonecipher made the changes and returned the completed form to Mr. Payne for the latter's signature. At the time petitioners' 1980 tax return was prepared, Mr. Payne was unaware that petitioners had sold silver and gold coins. Petitioners filed their 1980 tax return on April 10, 1981. Petitioners' total basis in the silver and gold coins which they sold*55 in 1980 was $ 17,200. The long-term capital gain from these coin sales amount to $ 71,660. Though both petitioners were aware that profits had been generated from the coin sales, these profits were not reported as income on the petitioners' 1980 tax return. 13 The $ 71,660 long-term capital gain resulted in an increase in petitioners' 1980 adjusted gross income of $ 28,664 14 and a corresponding increase in their tax liability for the year of $ 15,279. 15After making an opening statement, respondent rested his case in chief. Respondent did, however, cross-examine*56 Mr. and Mrs. Stonecipher, the only two witnesses appearing at the trial of this case. OPINION Respondent takes the position that petitioners' underpayment of income tax for the taxable year 1980 is due to fraud. Sec. 6653(b) 16 provides an addition to tax of 50 percent of the amount of a tax deficiency if any part of the underpayment is due to fraud. To sustain a fraud determination under section 6653(b), respondent has the burden of proving by clear and convincing evidence (1) that there was an underpayment of tax and (2) that some portion of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b); Hebrank v. Commissioner,81 T.C. 640, 642 (1983). Petitioners concede that they have underpaid their taxes for 1980. Accordingly, the first element of fraud is established. To establish the second element under section 6653(b), respondent must demonstrate by clear and convincing*57 evidence that the taxpayer had a specific intent to evade a tax due and owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. 17Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 939 U.S. 1020 (1969); Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Stringer v. Commissioner,84 T.C. 693, 713 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986). Fraud must never be presumed or decided on the basis of suspicion. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Thurston v. Commissioner,28 T.C. 350, 355 (1957). Nonetheless, fraud need not be established by direct evidence, but may be established from all relevant facts and circumstances. Kotmair v. Commissioner,86 T.C. 1253, 1260 (1986); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971);*58 Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). After a careful examination of the entire record in this case, we conclude that respondent has not successfully carried his burden of proof. Respondent argues that petitioners' failure to report $ 28,664 in adjusted gross income in 1980 may be used to establish fraud. Respondent, however, introduced no evidence of "consistent failure to report substantial amounts of income over a number of years," Harper v. Commissioner,54 T.C. 1121, 1139 (1970); Vise v. Commissioner,31 T.C. 220 (1958), affd. 278 F.2d 642 (6th Cir. 1960), and we see no reason to consider as conclusively significant one year's understatement of taxable income. See Switzer v. Commissioner,20 T.C. 759, 765 (1953); Nicholson v. Commissioner,32 B.T.A. 977, 989 (1935),*59 affd. 90 F.2d 978 (8th Cir. 1937). An understatement of income does make a return erroneous. Absent a showing of an intent to evade a tax due, however, such understatement does not of itself make the return fraudulent. Respondent also asserts that petitioners' handling of the funds they received from F. J. Vollmer on the sale of the coins evidences an intent on the petitioners' part to conceal income. We do not agree. We find nothing surreptitious in petitioners' receipt of checks in large denominations from F. J. Vollmer, in their conversion of these checks to cashiers' checks denominated in equally large amounts at a bank located across the street from F. J. Vollmer and used by this coin dealer, 18 in their use of these cashiers' checks to purchase a new residence in Mississippi, and in their use of the sums received from the law firm of Favre, Germ, & Scafide to open a checking account in the area in which their new home was located. Petitioners' explanations in support of their actions are plausible, and respondent has failed to come forward with evidence which sufficiently places these explanations in doubt. 19*60 Respondent also relies on the intelligence of petitioners and their maintaining adequate records and keeping receipts as evidence which supports a factual finding of fraud. We have considered this evidence and do not find that it tips the scale toward such a determination. In primarily relying on the tax return he had filed for the previous year, a return on which he had to report no capital gains, Mr. Stonecipher may well have been careless in preparing his and his wife's joint tax return for 1980. Additionally, Mr. Stonecipher's failure to look to the coin sale records and receipts in his possession and Mrs. Stonecipher's failure to carefully examine the couple's return prior to her signing it constitute carelessnes. However, findings of carelessness do not justify a finding of fraud. 20Ench v. Commissioner,325 F.2d 1017 (3d Cir. 1964), affg. per curiam without opinion a Memorandum Opinion of this Court; Green v. Commissioner,66 T.C. 538, 549 (1976); Mitchell v. Commissioner,45 B.T.A. 822, 825-826 (1941). *61 Finally, respondent submits that petitioners have failed to provide an explanation for their income reporting lapse and that this failure is an indicium of fraud. A failure to explain an understatement of income may constitute evidence of fraud. Lessman v. Commissioner,327 F.2d 990, 994 (8th Cir. 1964); Koscove v. Commissioner,225 F.2d 85, 87 (10th Cir. 1955), affg. a Memorandum Opinion of this Court. In this case, however, petitioners have attempted to account for their underreporting of taxable income. Petitioners have shown that their 1980 return was prepared in two separate locations during a period of time in which they made a hectic and tiresome move. They have also shown that, when Mr. Stonecipher filled out the couple's 1980 return, he mistakenly relied on their tax return filed for the previous year. Though respondent suggests that these showings are a weak explanation, we find, nevertheless, that these do proffer an explanation for petitioners' inadvertence. Having carefully considered respondent's arguments and the evidence in this case, we hold that he has failed to carry his burden of proof by clear and convincing evidence.*62 Accepting such, we do not sustain the addition to tax determined against petitioners under section 6653(b). To reflect the foregoing, Decision will be entered under Rule 155.Footnotes1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year in issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩2. The petitioners concede that their taxable income for 1980 should be increased by $ 28,664. Respondent concedes that petitioners qualify for income averaging for 1980 with base period income as follows: 1979 - $ 42,016.92; 1978 - $ 38,094.44; 1977 - $ 47,720.36; and 1976 - $ 43,576.07. As a result of respondent's concession, a computation under Rule 155 is necessary. ↩3. At this point, we note that respondent did not argue in the alternative the applicability of sec. 6653(a)'s addition to tax. ↩4. Mr. Stonecipher reported the income generated from the rental property he owned on a Schedule E and the income generated from Jesse E. Stonecipher & Associates on a Schedule C. He attached both of these schedules to his and his wife's 1980 joint tax return. In preparing these schedules, Mr. Stonecipher referred to ledger books and records which he kept for both these business activities. On line 16 of their 1980 Form 1040 tax return, the petitioners also reported a "supplemental gain" in the amount of $ 1,500 based on Mr. Stonecipher's sale in that year of a truck which he had utilized in the operation of Jesse W. Stonecipher & Associates and for which he had previously claimed depreciation deductions. The calculation of this supplemental gain appeared on Form 4797 - Supplemental Schedule of Gains and Losses - accompanying petitioners' 1980 return. Mr. Steonecipher recorded the truck sale in a ledger he had labelled "Depreciation Schedules and Expenses for Operating Vehicles." This ledger was kept in the course of Mr. Stonecipher's aviation accident investigation business. ↩5. After his retirement from the University, Mr. Stonecipher continued working as an accident investigator and reconstructionist. In retirement, Mr. Stonecipher also estimated that he would receive approximately $ 60,000 per year in benefit payments tied to Social Security, pension plans in which he was a member, and tax shelter annuities and Keoghs in which he participated. ↩6. Petitioners wanted to buy their Mississippi home outright because they did not want to be saddled with mortgage payments during Mr. Stonecipher's retirement. ↩7. Mr. Stonecipher kept a copy of each cashier's check as a record of the coin sale. These copies he placed either in the manila folder he labelled "Coins" or in a manila folder he labelled "Pass Christian." ↩8. Mr. Stonecipher did not accompany his wife on this second sale because he had to give a lecture at the University of Illinois. ↩9. Mr. Stonecipher kept a copy of each of these cashier's checks as a record of this second coin sale. These copies he placed either in the manila folder he labelled "Coins" or in a manila folder he labelled "Pass Christian." ↩10. Petitioners purchased their Pass Christian residence without the aid of an attorney acting on their behalf. Furthermore, Mr. Stonecipher did not have an attorney search the title of the Mississippi residence prior to his and his wife's purchase of this residence, and he did not know whether he had obtained title insurance. ↩11. Because of the confusion and hecticness tied to this return trip to Illinois, petitioners decided that in the future they would no longer move between their Illinois and Mississippi homes, but that they would stay permanently in Mississippi. ↩12. Prior to 1980, petitioners never had a transaction reportable on Schedule D of their Federal income tax return. Additionally, petitioners made no coin sales prior to January 18, 1980. ↩13. Mr. Stonecipher was aware that capital gains are taxed. Additionally, in signing the couple's joint return, Mrs. Stonecipher failed to check the return to see if the profits from the coin sales had been reported. ↩14. In determining adjusted gross income in 1980, a taxpayer was granted a deduction from gross income equal to 60 percent of the amount of the taxpayer's net capital gain for the taxable year. Former secs. 1202 and 62(3) embodied this deduction. ↩15. Other than requiring petitioners to report their 1980 capital gain income, respondent made no income adjustments to petitioners' 1980 tax return. ↩16. Sec. 6653(b) provided, in pertinent part, as follows: (b) Fraud. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. ↩17. Quoting from Merten's Law of Federal Income Taxation, we have said, "The Commissioner does not have to establish his determination of fraud beyond a reasonable doubt, but fraud must be established by more than a mere preponderance of the evidence; * * *." Kellett v. Commissioner,5 T.C. 608, 616↩ (1945). 18. We note that a portion of one of the 15 F. J. Vollmer checks and the full amount of another of these checks were converted into cash. ↩19. An unsubstantiated allegation found in respondent's reply brief represents an example of this party's failure to come forward with evidence. Respondent alleged that petitioners received a number of cashier's checks from the McLean County Bank because they wanted to avoid the bank's having to report to Federal authorities under 31 U.S.C. sec. 5311, et seq. (1982)↩, the conversion of the F. J. Vollmer checks to cashier's checks. However, no evidence was produced in the form of documentation or testimony to support this allegation. We infer from such a totally unsubstantiated allegation that respondent is grasping for straws to support a determination that is without adequate factual foundation. The injection of such groundless allegations to support respondent's position only serves to confirm the weaknesses of his case and to persuade us that respondent was preoccupied with punishment rather than appropriate proof. 20. We note that no evidence has been presented that petitioners falsified or destroyed any records or receipts tied to their coin purchases and sales. Additionally, there is no evidence that petitioners misrepresented facts to respondent, failed to cooperate with respondent, or constructed a device to hide income. Petitioners' transactions were at all times out in the open. Such circumstances do not indicate a willful effort to underreport income and evade tax. Dagon v. Commissioner,T.C. Memo. 1984-138↩.